[Civ. No. 21370. Second Dist., Div. Two. July 11, 1956.]

Estate of JESSIE ALICE MOORE, Deceased. MARGARET C. FARRELL et al., Respondents, v. HERMAN K. MOORE et al., Appellants.

Delvy T. Walton for Appellants.

Louis Ballenger, Donovan W. Ballenger and Lawrence William Steinberg for Respondents.

ASHBURN, J.—Appeal from order probating holographic will of Jessie Alice Moore, deceased, after contest instituted

before probate. Decedent never married. She left three sisters, two of whom, Margaret C. Farrell and Edna M. Nankervis, were named as executrices and are the proponents of the will. The other sister, Clara L. Barnes, and an only living brother, Herman K. Moore, contested probate upon the grounds of mental incompetence and undue influence exercised upon testatrix by the two proponents. Trial was had without a jury; the trial judge found that testatrix was mentally competent and that there was no undue influence brought to bear upon her; also that the will was entirely written, dated and signed by decedent and is a valid holographic will.

Appellants' major contention is that the evidence is insufficient to support the finding of absence of undue influence. The claim of mental incompetence is distilled by appellants' brief into one of mental and physical weakness such as renders a testatrix vulnerable to the exercise of undue influence upon her.

■ Upon a claim of insufficiency of the evidence the burden rests upon appellant "to demonstrate that there is no substantial evidence to support the challenged findings." (*Nichols* v. *Mitchell*, 32 Cal.2d 598, 600 [197 P.2d 550].)

■ The power of an appellate court begins and ends with a determination of whether there is any substantial evidence, direct or indirect, contradicted or uncontradicted, to support the inferences adopted by the trial judge or jury. ■ The review starts with a presumption that there is evidence in the record which sustains every finding of fact. (*Tesseyman* v. *Fisher*, 113 Cal.App.2d 404, 407 [248 P.2d 471].) ■ When different inferences reasonably can be drawn from the evidence the reviewing court is without power to substitute its deductions for those of the trial court. (*Owens* v. *White Memorial Hospital*, 138 Cal.App.2d 634, 638 [292 P.2d 288].)

■ "All of the evidence most favorable to the respondent must be accepted as true, and that unfavorable discarded as not having sufficient verity to be accepted by the trier of fact. If the evidence so viewed is sufficient as a matter of law, the judgment must be affirmed." (*Estate of Teel*, 25 Cal.2d 520, 527 [154 P.2d 384].) The same case says, at page 526: " 'The rules of evidence, the weight to be accorded to the evidence, and the province of a reviewing court, are the same in a will contest as in any other civil case. . . . The rule quoted is as applicable in reviewing the findings of a judge as it is when considering a jury's verdict.' "

Construing the evidence and permissible inferences in the light of these pronouncements the story of the subject will is as follows:

Jessie Alice Moore (commonly called "Alice" in the family), a single woman, died at the age of 78 on May 1, 1953, leaving as next of kin the three sisters and brother named in the first paragraph hereof, also nine nephews and nieces. At the age of 14 she had had poliomyelitis which left her lame in one leg necessitating the use of a cane or crutches at times. When 25 years old she had been struck by lightning, the steel brace on her leg apparently acting as a conductor and saving her from a major catastrophe. This experience left her highly sensitive to thunderstorms and attendant electricity. Her doctor called it an "allergy to thunder and lightning." He said also that she "could tell before the storm broke that there was going to be a storm, she could forecast it." Such storms prostrated her for variable periods of time. But her mind and will were never affected. Always her mind was normal and the will was strong.

After her mother's death in 1943 she and a sister, Cozetta, lived with an unmarried brother, Terry Lee Moore. He died on June 30, 1946, and left the major portion of his estate, appraised at $35,575, to the two sisters as joint tenants. They gave a distributees' receipt for property valued at $23,907; it consisted of cash, a trust deed note and shares of corporate stock, no real estate. Shortly after this event these two sisters and contestant Clara L. Barnes bought a home together, Mrs. Barnes a half interest and Alice and Cozetta the other half. They resided in this house together, the two sisters and the Barnes family, until Cozetta's death in 1949. Alice and the Barnes family continued to live together until her death. She paid board and assisted with the household chores.

Soon after Terry's death Alice and Cozetta made wills in practically the same form, leaving their property to each other except the sum of four dollars which was distributed one dollar each to Clara, Margaret, Edna and Herman. Each of these wills was on a printed form. It came from the family attorney, Mr. Hugh Y. Gibson, and the blanks were typed except for name of executor and the date. Mrs. Farrell (known to the family as "Maggie") was given the document by Mr. Gibson and told to insert the name of the executor, neither he nor she knew who was to act in that capacity. This she did when told by the testatrix that she

and Mrs. Nankervis (Edna) were to be executrices. Mrs. Farrell did not know any of the other contents of that will. She did not have custody of it. ▉ Alice had a suitcase under her bed in which she customarily kept all her valuable papers other than securities. What became of that will no one knows. The inference is that it was destroyed by her when Alice made a second will following Cozetta's death on June 30, 1949. (*Estate of Ronayne,* 103 Cal.App.2d 852, 856 [230 P.2d 423].) Mrs. Farrell and Mrs. Nankervis had no part in drawing or execution of this second will and its contents remain unknown. Alice could not ride streetcars and seldom rode in an automobile. Mrs. Farrell did her banking and similar business for her through the years. Testatrix gave her this second will in an envelope labeled ''Will'' for the purpose of placing it in a safety deposit box which Mrs. Farrell and Mrs. Nankervis had in the Security-First National Bank. Mrs. Farrell complied with this request. It stayed there until Alice asked for it and it was returned to her pursuant to that request which was made prior to the execution of the third will, the one now being contested. This second will was not seen again by anybody and presumably was destroyed by testatrix when she made the last one, which is dated November 5, 1951. The exact contents of the second will are not known. Mr. Gibson, who drew it, died in May, 1951.

Shortly after that time, in the summer of that year, Alice told the widow, Mrs. Myrtle G. Gibson, how much she missed her friend and attorney, told her he had helped on the 1949 will and said she was going to make a new will and do it herself; that she planned to make one entirely in her own handwriting. This plan she followed. She called for the second will which was in the safety deposit box and Mrs. Farrell delivered it. Without consultation with Mrs. Farrell, Mrs. Nankervis, or anyone else, Alice wrote the will with her own hand. Its phrasing indicates copying at places. For instance, the introductory language is the same as the Wolcott printed form which was used for Cozetta's will (copied in the record at bar). The evidence is to the effect that Cozetta's and Alice's contemporaneous wills of 1946 were almost identical, hence a reasonable inference arises that testatrix copied that part of her last will from the one of 1946 or its successor of 1949. The instant will also contains two detailed property descriptions which were necessarily copied from some other document. As testatrix kept

many of her valuable papers in the suitcase under her bed the deeds to these properties, owned by her, well may have been there and have been copied in preparation of the will now before us.

When it was completed the author handed it to Mrs. Farrell in a sealed envelope bearing an endorsement in her own handwriting, reading substantially as follows: "My Last Will and Testament, as of November 5, 1951. Jessie Alice Moore." She told Mrs. Farrell that it was her last will, that she had destroyed her former one, and asked her to put it in the safety deposit box. She did not say that Maggie and Edna were named as executrices or how the estate was to be distributed. The will reposed in that box until after testatrix' death a year and a half later. During the Christmas season of 1952 she told Mrs. Nankervis that she had made her will and had put her and Maggie on as executrices. She also made the statement that she had written it herself and that she had mentioned every member of the family. Contestant Herman K. Moore testified, without specifying any approximate date, that on one of his visits to his sister "she said she had everything in good shape; that she had made her will and everything was in good shape." The context indicates that the witness was probably referring to a conversation about this 1951 will.

A week after testatrix' death the relatives met at Herman K. Moore's home for a reading of the will. Mrs. Farrell produced it; she had prepared in advance a memorandum which she then and there asked all the assembled relatives to sign. It reads: "To whom it may concern: We, the undersigned, were present at the reading of the last will and testament of Jessie Alice Moore, which was sealed and date written in her own handwriting as of November 5, 1951. The seal was broken and will was read May 8, 1953." It does not say in substance or effect, as appellants claim, that the will (in the sealed envelope) was written entirely in decedent's handwriting; on the contrary it refers to the endorsement upon the envelope. About half the relatives signed it. Contestant Herman K. Moore and his son refused to do so. The father warned Mrs. Farrell not to probate the will, claiming there was an agreement that the property was to be divided equally among the surviving brother and sisters. Mrs. Farrell and Mrs. Nankervis declared they would see that their sister's wishes were carried out, and the fight was on.

It cannot be gainsaid that this record contains ample proof

that the testatrix was fully competent to make a will at the time she executed it on November 5, 1951.

██ Upon the issue of undue influence counsel for appellants relies upon the presumption which arises out of activity of one who occupies a fiduciary relationship to the testatrix, is active in the preparation or execution of the will and unduly profits therefrom. Those elements being present a presumption of undue influence arises and the burden rests upon proponent of the will to overthrow or offset it. (*Estate of Shay,* 196 Cal. 355, 363 [237 P. 1079].) The existence of a confidential relationship between testatrix and her two sisters, Maggie and Edna, is conceded by respondents. But each of them, when testifying, specifically denied any participation in the making of the will. An elaborate and exhaustive and repetitive cross-examination left their testimony in such shape that the trial judge was unquestionably warranted in accepting it unless he concluded (as he did not) that the circumstantial evidence to the contrary was more convincing. To raise the presumption counsel for appellants necessarily relies upon circumstantial evidence and only on that type of proof, with one exception—a piece of hearsay which will be separately discussed.

It is well to have in mind the exact thing that contestants would thus establish by indirect evidence. ██ "Proof, to establish undue influence, must be had of a pressure which overpowers the mind and bears down the volition of the testator at the time the will is made. ██ It consists in the exercise of acts or conduct by which the mind of the testator is subjugated to the will of the person operating upon it. [Citing cases.] ██ Mere proof of opportunity to influence a testator's mind, even when coupled with an interest or motive to do so, will not sustain a finding of undue influence in the absence of testimony showing that there was pressure operating directly on the testamentary act and to such an extent as to affect the terms of the testament. [Citing cases.] ██ It is not sufficient for a contestant merely to prove circumstances consistent with the exercise of undue influence, but, before a will can be overthrown, the circumstances proved must be inconsistent with voluntary action on the part of the testator." (*Estate of Donovan,* 114 Cal.App. 228, 233 [299 P. 816].) ██ "Mere general influence, however strong and controlling, not brought to bear upon the testamentary act, is not enough; it must be influence used directly to procure the will, and must amount to *coercion* destroying free

agency on the part of the testator. (*Estate of Keegan,* 139 Cal. 123, 127 [72 P. 828].) It is further held that mere opportunity to influence the mind of the testator, even coupled with an interest or a motive to do so, is not sufficient. (*Estate of Easton,* 140 Cal.App. 367, 371 [35 P.2d 614].)'' (*Estate of Arnold,* 16 Cal.2d 573, 577 [107 P.2d 25].) ''It is not sufficient for a contestant merely to prove circumstances consistent with the exercise of undue influence; but before the will can be overthrown the circumstances must be *inconsistent* with voluntary action on the part of the testator.'' (*Estate of Welch,* 43 Cal.2d 173, 178 [272 P.2d 512].) ██ ''Proof of conduct which merely inspires affection and gratitude, standing alone, does not even tend to prove undue influence. If it results in recognition by a testamentary act it is regarded as a natural and proper result. If the acts themselves are not be be [sic] condemned, the fact that they are inspired by a selfish motive does not give them legal significance.'' (*Estate of Doty,* 89 Cal.App.2d 747, 755 [201 P.2d 823].) These principles have been often repeated. (See *Estate of Bould,* 135 Cal.App.2d 260, 269-270 [287 P.2d 8, 289 P.2d 15].)

The 1600 page transcript herein discloses that each of the circumstances upon which appellants rely to establish cumulatively the presumption of undue influence is itself met by proof to the contrary or is not fairly susceptible to the construction placed upon it by appellants' counsel. There are few, if any, exceptions. The argument that the combined effect of these circumstantial items (accepted with appellants' construction upon each of them) demonstrates that proponents' testimony is inherently improbable must fail. ██ The accepted principle is stated in *People* v. *Huston,* 21 Cal.2d 690, 693 [134 P.2d 758]: ''To warrant the rejection of the statements given by a witness who has been believed by a trial court, there must exist either a physical impossibility that they are true, or their falsity must be apparent without resorting to inferences or deductions.'' (See also *Murphy* v. *Ablow,* 123 Cal.App.2d 853, 858 [268 P.2d 80]; *Estate of Reed,* 132 Cal.App.2d 732, 735 [282 P.2d 935]; 4 Cal.Jur.2d § 610, p. 492.)

The attempted proof of activity of Mrs. Nankervis in procuring preparation or execution of the will is not sufficient to raise a robust suspicion, and that relating to Mrs. Farrell is not enough to create the presumption of undue influence or to overthrow her positive evidence that she had no part

in making the will. Temptation is strong to discuss the arguments of respective counsel upon the various items which appellants claim to be contradictory of Mrs. Farrell's testimony, but that would add nothing to the body of the law and it is not the function of a reviewing court to undertake to convince appellants' counsel that the judgment is correct.

■ "It is not the province of a reviewing court to present a detailed argument on the sufficiency of the evidence to support the findings where it appears that the question is one purely of determining which side shall be believed. The trial court having determined this with the witnesses before it, the controversy is settled. (*Gillespie* v. *Gillespie,* 121 Cal. App.2d 95, 97 [262 P.2d 607].)'' (*Sonkin* v. *Hershon,* 130 Cal.App.2d 491, 492 [279 P.2d 156].)

The item of direct evidence upon which appellants rely is testimony of Evelyn M. Burkett (a neighbor) that Alice, in September, 1952, told her "that she had her will made''; "that Maggie had helped her, and 'Maggie is my administrator, and Mrs. Nankervis.' '' This evidence seems to have been received without objection[1]; at any rate respondents do not argue otherwise. Their attorney relies upon *Estate of Ricks,* 160 Cal. 450, 466 [117 P. 532], wherein it is said " [D]eclarations made subsequent to the execution of a will are never admissible as proof themselves of undue influence or fraud. After the execution of his will a testator is no more permitted to impeach its validity by declarations respecting it than can the validity of any other instrument be impeached by subsequent declarations of the maker respecting it.'' Numerous cases are cited in support of this ruling but examination of them discloses that the quoted language is based upon a recognition of the fact that such statements are hearsay; the rule seems to have no other basis. In *In re Calkins,* 112 Cal. 296, 300 [44 P. 577], it is said, concerning such declarations made after the execution of a will: '' [T]o the extent that they purported to be declarations of the acts of others, or of her own acts, they were but matters of hearsay merely, whose truth rested in the veracity of the utterer, and upon which there was no opportunity of cross-examination or of explanation by the party who had uttered them, and were not entitled to any weight by the jury, and cannot be considered for the purpose of sustaining their verdict.'' In the later case of *Estate of Jones,* 166 Cal. 108, 117

---

[1]The transcript is a bit obscure at this point.

[135 P. 288] : "The declaration 'I was talked into making the will and cutting my boy off without a cent' was a narrative or relation by the testator of a past event, an express declaration that undue influence had been exercised upon him whereby he was caused to make this will. We have so often declared that such evidence is hearsay and inadmissible for that purpose that it is unnecessary now to discuss the subject."

True, hearsay received without objection may be considered on appeal in support of a finding (19 Cal.Jur.2d § 389, p. 123) ; this is the form in which the rule is generally stated but actually it goes further. Such evidence when so received is to be considered like any other and given such weight as it inherently is entitled to have. 20 Am.Jur. § 452, pp. 401-402: "In fact, the general rule to which only a small minority of jurisdictions take exception is that hearsay testimony admitted without objection may properly be considered and given its natural probative effect. . . . Of course, the weight of hearsay evidence is minimized by the same inherent weaknesses which are grounds for its exclusion when proper objection is made." (See also 20 Am.Jur. § 1185, p. 1036, and anno. in 104 A.L.R. 1130.) This view of the matter was expressed by this court in *Duff* v. *Schaefer Ambulance Service, Inc.*, 132 Cal.App.2d 655, 669 [283 P.2d 91], where it is said: " [T]hat uncorroborated testimony as to an oral declaration of a deceased person is the weakest form of evidence and is open to suspicion; but, where admissible, it will be weighed by the trier of facts the same as other evidence and may be disregarded where shown to be unconvincing or insubstantial. (*Estate of Emerson,* 175 Cal. 724, 727 [167 P. 149].) " To the same effect is *County Nat. Bank & Trust Co.* v. *Sheppard,* 136 Cal.App.2d 205, 222 [288 P.2d 880]. Manifestly no court has held or would hold that hearsay, though received without objection, must be accepted in preference to sworn testimony to the contrary. The trial judge accepted Mrs. Farrell's testimony in this regard, rejected the hearsay and committed no error in so doing.

It is argued that the will is unnatural and that proponents unduly profited thereby. This contention, like that of active participation of proponents in bringing about the will, dissolves under analysis of the facts. It is based upon the claim that Mrs. Nankervis is left $13,000 and Mrs. Farrell $8,000, out of an estate of $44,000, while Mrs. Barnes is given $500 and her brother Herman K. Moore $400. It

appears from the partial inventory and appraisal in the original probate file that a value of $40,221.26 was there placed upon the estate; that in addition to the legacy of $500 to Mrs. Barnes her daughter Cozetta is given $1,800; that decedent's half interest in the Mariposa Street home (in which Mrs. Barnes now lives) is left in equal shares to her three children, Jesse Earl Barnes, Leonard Roy Barnes and Cozetta E. Barnes. That interest was appraised at $5,925. The total gift to the Barnes family thus amounts to $8,225. Herman K. Moore receives under the will the sum of $400 plus the forgiveness of two notes, one for $1,800 dated in 1926, and one for $800 made in 1932. His children's legacies are, Margaret F. Shaw $1,600, Donald K. Moore $1,600, and Dorothy E. Hinricks $250. This makes a total of $6,450 to the Herman K. Moore family. The fact that the notes were apparently barred by limitation is of no consequence for the testatrix deemed them to be obligations which she desired to forgive— thus in effect enforcing payment in the process of equalizing her legacies according to her own view of equity. The Nankervis family received $17,800, viz., Mrs. Nankervis $13,000, Eva M. Thompson $1,600, Ralph V. Nankervis $1,600, and Zelma M. Lockhart $1,600. Mrs. Farrell is left $8,000; she appears to have no family. In case of intestacy she would have inherited one-fourth of the estate, $11,000 according to appellants' valuation or about $10,050 according to the probate appraisal; of course her share of the costs of administration is to be deducted as in all other instances. The observations of the court in *Estate of Shay, supra,* 196 Cal. 355, 364, are pertinent: "Much is said in respondent's brief upon the subject of an unjust and unnatural will and the inference of undue influence to be deduced therefrom. That expression is usually applied in a case where a testator leaves his estate or a large portion thereof to strangers to the exclusion of the natural objects of his bounty without apparent reason therefor. The will here under attack cannot be said to be an unnatural will (*Estate of Packer,* 164 Cal. 525 [129 P. 778]). By it the testator made provision for all of the natural objects of his bounty. That he did not provide for them equally is but to say that he exercised his legal right of testamentary disposition instead of leaving his estate to be distributed according to the law of succession. Whether or not the will is unjust is a matter of opinion, as to which we have no right to substitute the opinions of the jurors or of the members of this court for that of the testator. The evidence

discloses that there were reasons present in the mind of the testator for the discrimination against these contestants. Whether those reasons were good or bad was not for the jurors to say and is not for this court to determine.'' *Estate of Casassa,* 98 Cal.App. 97, 98 [276 P. 366] : ''To say that a testator may not give to one legatee selected from a certain class more than he gives to another legatee selected from the same class is, in legal effect, to say that a testator has no right to make a will.''

Contestants asserted throughout the trial that the instant will violates a long standing agreement, an oral one, made by all members of the Moore family, that the property owned by their mother should be held in trust so long as necessary for the support of her two semiinvalid daughters, Alice and Cozetta, and upon the death of the survivor should be divided equally among her then living children. There is credible evidence that Mrs. Moore had no property at the time of her death; she had conveyed her residence to the son Terry during her lifetime and he supported her. He was industrious and frugal, saved his money and at his death left a will bequeathing the residue of his estate to Alice and Cozetta, as joint tenants, ''the survivor to will as she chooses.'' This estate consisted of war savings bonds, bank accounts, real estate, corporate stocks, all of an appraised value of $35,575. A receipt of Alice and Cozetta as distributees acknowledges delivery to them of items appraised at a total of $23,907. No real estate is included therein. Nor is there evidence of any substantiality (none other than hearsay, conclusion and conjecture) which identifies this property with any previously owned by the mother or with the proceeds of same. Mrs. Nankervis testified that Terry's estate did not come from his mother. Contestants' claims concerning such an agreement were specifically denied by proponents, whose testimony was accepted by the trial judge. The entire evidence on this subject of an oral agreement is so vague, so nebulous, that it probably would not sustain a finding favorable to contestants had one been made.

In order to establish an oral trust in personalty the evidence must be clear and convincing. ''It is a cardinal rule that trusts in personalty may be created, declared, or admitted verbally and may be proved by parol evidence, but the authorities are uniform to the effect that such evidence must at all times be clear and unequivocal.'' (*Lefrooth* v. *Prentice,* 202 Cal. 215, 227 [259 P. 947].) To the same effect

see *Chard* v. *O'Connell*, 7 Cal.2d 663, 665 [62 P.2d 369];
*Estate of Capolino*, 94 Cal.App.2d 574, 577 [210 P.2d 850].
The proof at bar does not measure up to that standard. The
court properly found that there was no such agreement.

The will is holographic. Appellants attempt to overthrow
the finding that decedent disposed of her estate "by a holo-
graphic will which was entirely written, dated and signed in
the handwriting of the said Jessie Alice Moore." This they
do by calling attention to the facts about to be enumerated.
The first page is written in blue ink and the second and third
in black. The three sheets were not physically attached to
each other but they were in the same sealed envelope bearing
an endorsement in testatrix' handwriting. The first page
shows an alteration in the recital of testatrix' age. As orig-
inally written it says, "age 73 years"; this figure has been
changed to "76." The evidence is to the effect that all of this
will, including date, signature and the change from 73 to
76 is in testatrix' handwriting. Contestants had a well known
handwriting expert, Mr. Clark Sellers, in the courtroom but
he did not testify on this subject. It may be true, as ap-
pellants contend, that this first page was a portion of a former
will or draft of one; the envelope in which the second will
was contained bore an endorsement in blue ink; it is inferable
that the age recital on the first page was changed and two
new pages in black ink added to make up the last will of
November 5, 1951. ▇ But it is not necessary that a holo-
graphic will be made on a single day, or that it be one con-
tinuous act. ▇▇ Interlineations made by the testator,
even though that be done after execution, do not destroy the
will. They become a part of it, and the fact that separate
sheets are not fastened together is not fatal where they re-
flect a continuous chain of thought. (*Estate of Dumas*, 34
Cal.2d 406 [210 P.2d 697]; *Estate of Finkler*, 3 Cal.2d 584,
600 [46 P.2d 149]; *Estate of Clisby*, 145 Cal. 407, 409 [78 P.
964, 104 Am.St.Rep. 58].) Pages one and two of this will con-
tain at the bottom these words: "continued on page 2" and
"continued on page 3." The second and third pages are num-
bered appropriately. There is no break in the flow of thought.
There was no error in the ruling that this is a valid holo-
graphic will.

An elaborate attack upon the findings is made. It has
merit, but not enough to work a reversal. The draftsman
went through the allegations of the pleadings paragraph by
paragraph, quoting same and declaring each paragraph to be

true or untrue. Adopted by the court, this led to numerous conflicts and some erroneous findings as to evidentiary facts. This is a practice which has been condemned. "A large part of the argument made for reversal of the judgment grows out of the fact that the findings of the court were made by reference to paragraphs of the pleadings. This is always an unsatisfactory method of drawing findings, and inaccuracies and conflicts are frequent when such method is adopted." (*Epstein* v. *Gradowitz,* 76 Cal.App. 29, 31 [243 P. 877].) "Counsel for defendant made the mistake of drafting the findings in large part by reference to the allegations of each paragraph of the complaint. That is always an unsatisfactory method of drawing findings; inaccuracies and conflicts are frequent when that method is adopted." (*Kaye* v. *Tellsen,* 129 Cal.App.2d 115, 119 [276 P.2d 611].) However, the trial judge specifically found: "That on the 5th day of November, 1951, the date of the execution of the Last Will and Testament of Jessie Alice Moore, deceased, said testatrix was 76 years of age, or thereabouts, and was of sound and disposing mind, and not acting under duress, menace, fraud, or undue influence, and was in every respect competent, by last will, to dispose of all her estate. . . ." Undue influence and competency to make a will are the ultimate facts in this case. (*Estate of Berry,* 195 Cal. 354, 361 [233 P. 330].) "A reviewing court will liberally construe findings in support of the judgment. Any uncertainties will be construed so as to uphold rather than defeat the judgment. (4 Cal.Jur.2d 444, § 571.) In reviewing the sufficiency of findings to support a judgment, the court will regard the ultimate facts found." (*Kaye* v. *Tellsen, supra,* 129 Cal. App.2d 115, 119.) The findings as to the evidentiary facts may be ignored. (*Estate of Berry, supra,* 195 Cal. 354, 360; 2 Witkin on California Procedure, p. 1854, § 121(3).) In the circumstances the findings at bar cannot be held prejudicially erroneous.

An order denying a new trial is not appealable. (3 Cal. Jur.2d, § 62, p. 500.) The attempted appeal from that order is dismissed.

The judgment is affirmed.

Moore, P. J., and Fox, J., concurred.