[Civ. No. 24033. Second Dist., Div. One. Apr. 18, 1960.]

THE PEOPLE, Respondent, v. FREDERICK H. HECKER,
Appellant.

William J. Cusack for Appellant.

Stanley Mosk, Attorney General, Walter S. Rountree, Assistant Attorney General, Benjamin E. King and Manly D. Calof, Deputy Attorneys General, for Respondent.

LILLIE, J.—Plaintiff sued defendant Hecker and others to condemn certain parcels of land lying seaward to the Pacific Ocean. Although the issue of title was determined by the court, the question of value was heard by the jury. Hecker was declared to be owner of Parcels A, C and D, and the underlying fee of E, as to Parcel B, the trial court found that it consists entirely of artificial accretions, adjudged the state the owner thereof, and denied him any compensable right therein. It is from that portion of the judgment defendant appeals. The issues before us relate solely to the ownership of Parcel B and the existence of a frontage right or right of access to the sea.

Parcel B abuts the ocean and lies seaward from Parcel A; and since defendant acquired the property in 1913 the mean high tide line has progressed seaward. Near Parcel B were constructed the Santa Monica Pier in 1909, the Newcomb Pier in 1912 and a breakwater in 1933 and 1934; and it lies approximately 2,100 feet north of Newcomb Pier and 900 feet from the north end of the breakwater, which lies 2,000 feet long and 2,000 feet from shore. No artificial structure was ever erected at Parcel B. Between 1921 and 1954 accretions had extended the beach more than 400 feet seaward of the 1921 mean tide line fixed by the court as the seaward boundary (*Muchenberger* v. *Santa Monica*, 206 Cal. 635 [275 P. 803]), which constitutes all of Parcel B.

Appellant's primary contention is that, where alluvion is gradually and imperceptibly created, however caused, along

the shoreline, it belongs to the littoral owner; but if ownership depends on the cause of accretion, the trial court's findings that from 1875 to 1912 the shoreline of Parcel B was in a state of equilibrium and that certain artificial structures were the sole cause of accretion to Parcel B since 1921 are unsupported by the evidence. He further claims that regardless of the ownership of Parcel B, as the littoral owner he possesses a special and vested right of access to the sea, or a frontage right separate from the land, which is compensable.

Inasmuch as the law in California, in a controversy between the state and the upland proprietor, favors the view that title to artificially caused accretion vests in the state as the owner of the tidelands, we first review the evidence of the cause and nature of the accretion to Parcel B in support of the trial court's findings.

The determination of the factual issues by the trial court was, in the main, dependent upon extensive evidence admitted through the testimony of two experts for the People, Dr. Kenneth O. Emery and James W. Dunham; the report of a court-appointed expert, Dr. U. S. Grant; various lay witnesses familiar with Santa Monica beaches; and maps, photographs, charts, drawings, historical data, official reports and diagrams. Appellant predicates his argument of insufficiency of the evidence upon what he asserts to be opposing inferences and evidence, and inconsistencies in the expert testimony. It is, of course, for the trier of fact to determine the weight to be given to the opinion of an expert witness (*People* v. *Loop*, 127 Cal.App.2d 786 [274 P.2d 885]); it is the exclusive judge of the effect and value of the evidence (Code Civ. Proc., § 2061; *Ortzman* v. *Van Der Waal*, 114 Cal.App.2d 167 [249 P.2d 846, 252 P.2d 7]; *Petroleum Midway Co.* v. *Zahn*, 62 Cal.App.2d 645 [145 P.2d 371]) and the credibility of witnesses (Code Civ. Proc., § 1847), lay and expert (*Estate of Blake*, 136 Cal. 306 [68 P. 827, 89 Am.St.Rep. 135]; *Hirshfeld* v. *Dana*, 193 Cal. 142 [223 P. 451]); and it has the primary function of resolving factual conflicts. The rule of conflict of evidence applies as well to cases of inconsistencies and contradictions within the testimony of a single witness, all the more for the trier of fact "for being intestine." (*People* v. *Loop*, 127 Cal.App.2d 786, 800 [274 P.2d 885].) After carefully dissecting the testimony of the experts, appellant has here offered a factual argument for reversal which would better have been submitted by him to the trial court; he is, in effect, asking us to reweigh the value

828

of the opinion evidence and inferences to be drawn therefrom, and resolve any uncertainties, inconsistencies or conflicts in his favor. This we cannot do.

Where findings are attacked on the ground of insufficiency of the evidence, the power of the reviewing court begins and ends with a determination of whether there exists in the record substantial evidence, contradicted or not, which will support the same (*Primm* v. *Primm*, 46 Cal.2d 690 [299 P.2d 231]; *Grainger* v. *Antoyan*, 48 Cal.2d 805 [313 P.2d 848]) and if there is, the strength of the opposing evidence or inferences is immaterial, for evidence is not weighed on appeal (*Estate of Jamison*, 41 Cal.2d 1 [256 P.2d 984]).

Likewise, we are bound to liberally construe the findings in support of the judgment indulging in all reasonable inferences, resolving every substantial conflict in the testimony and construing any uncertainties in their favor (*Estate of Bristol*, 23 Cal.2d 221 [143 P.2d 689]; *Brewer* v. *Simpson*, 53 Cal.2d 567 [2 Cal.Rptr. 609, 349 P.2d 289]; *Estate of Moore*, 143 Cal.App.2d 64 [300 P.2d 110]).

Following these rules and viewing the evidence in the light most favorable to the judgment we conclude that there is substantial evidence to support the trial court's finding (XII) that from 1875 to 1912 the shoreline in the location of Parcel B was generally in a state of equilibrium, subject to seasonal fluctuation; and that this finding is not inconsistent with any other.

As to the status of the shoreline prior to 1912, Dr. Emery described a beach subject to seasonal variations based upon maps and charts; asked if he would describe it as a "static" beach in equilibrium, he answered: "It looks like it for that period." Relative to the sand budget in that area he explained that if there were no artificial structures natural forces would prevent any accumulation of accretion, for under normal conditions as much sand as goes into the Santa Monica Bay that would cause natural accretion would leak out the south end of the bay through Redondo Canyon and "(t)hat would mean there would be no net increase of the beach per unit of time." He concluded: "In reality, if there had been no structures (speaking of construction after 1912) we would have expected all of the sands which entered the Bay would have escaped through Redondo Canyon, and there wouldn't have been any widening at all." Mr. Dunham's opinion was that the area, under natural conditions, was "neither accreting nor prograding, nor receding prior to the construction of the

Santa Monica Pier'' in 1912, for ''a natural balance of shore processes had manifested themselves in this area prior'' thereto, in that the littoral material entering Santa Monica Bay would not accumulate to widen the beaches, but would flow out naturally into Redondo Canyon. He concluded that ''prior to 1912 this segment of shore was considered generally stable.''

Dr. Grant's report, contrary to that urged by appellant, does not state that there was a natural progradation of the shoreline after 1895. Dr. Grant discussed ''*prehistoric* beach widening'' and said that it was not possible to determine with certainty whether it would have continued to move the mean high tide line seaward. He reported that it might have reached an average static condition, for it seems unlikely the early rate of natural accretion would have continued undiminished. In speaking of beaches generally he concluded that the ''early rate of natural beach progradation'' would unlikely continue indefinitely, on the premise that they prograde to a limit ''at which equilibrium is reached between constructive and destructive processes.'' Dr. Grant not only did not state that the beach before 1912 was not static; but an inference that the shoreline was in equilibrium runs through his entire report ·—for instance, he acknowledged that the beach behind the breakwater had prograded from an approximate equilibrium position (Ex. F, p. 8); and in another part of his report stated, in describing a further condition, ''(I)f the equilibrium of the interacting shore processes had not been upset.'' (P. 21.) Any inference that the beach was naturally prograding between 1875 and 1912, from Dr. Grant's assumption that the accretion between 1921 and 1933 was ''natural,'' is wholly unreasonable for the latter is based on a self-admitted highly questionable and arbitrary premise. Dr. Grant ''assumed'' that the accretion between 1921 and 1933 was ''natural'' solely because he was unable to evaluate with any certainty the effects of the artificial structures after 1912, which ''assumption'' he concedes in his report ''is vulnerable to challenge'' and ''arbitrary.'' The trial court was entirely justified in failing to give as much weight to this evidence as to the definite opinions of the other two experts who directly asserted that a state of equilibrium existed subject to seasonal fluctuations, giving their reasons therefor.

Appellant relies upon the 1876 line of mean high tide to show an early progradation. This line was surveyed by the United States Coast and Geodetic Survey, and maps thereof were received in evidence; but it acknowledged a possible error of

30 feet in its survey. In addition, Mr. Dunham testified that the line was inaccurately plotted on the composite map (Ex. 57) showing the line 100 feet landward of the promenade and that properly plotted it would correspond with the seaward side of the promenade or the line of 1904, falling within the seasonal movement of the shoreline; and that a progradation from that point would show very little change in the beach. Dr. Emery and Mr. Dunham both testified that a shoreline trend could not be projected on the basis of some of the early shore positions.

In connection with the finding that the shoreline in question was in a state of equilibrium between 1875 and 1912, appellant raised the additional point that it is inconsistent with finding XIV—that due to lack of precise data the exact amount of artificial accretion prior to 1921 cannot be determined. He argues that "since the court found that lack of precise data prevented a determination of the effect of artificial forces prior to 1921, lack of precise data also prevented a finding of equilibrium." Liberally construing the findings in favor of the judgment (*Estate of Moore*, 143 Cal.App.2d 64 [300 P.2d 110]), all of the findings read and considered together do not justify such a conclusion (*Haight* v. *Haight*, 151 Cal. 90 [90 P. 197]).

The trial court found that since 1912, two piers and their effects caused artificial accretions to form along the shore at the location of Parcel B, but the amount thereof prior to 1921 cannot be determined due to lack of precise data. It further found, and the evidence shows, that the Santa Monica Pier was constructed 2,100 feet southeast of Parcel B in 1909, that in 1912 Newcomb Pier was constructed adjacent to the southeast side of the Santa Monica Pier; that pilings and debris from construction and abandoned or destroyed piers remained in the water in the vicinity of the pier and that the natural equilibrium prior to 1912 was upset subsequent thereto by certain specified structures.

The testimony of Dr. Emery and Mr. Dunham discloses that the two piers caused accretion which resulted in a bulge in the shoreline at the location of the piers, and that the combined effects of this and the piers themselves, caused accretion to form at Parcel B beginning sometime between 1912 and 1921 (as to exactly when progradation resulting from the piers started during that period neither could say, but both asserted that it was not later than 1921.) They testified that lack of precise data for 1912 to 1921 prevented them from determin-

ing *when* and to *what extent* Parcel B was affected by artificial accretion during that period. Furthermore, both evidence and findings are silent concerning any occurrence between 1912 and 1921 of any natural progradation with the exception of that caused by seasonal fluctuation; and both Dr. Emery and Mr. Dunham, and the court attributed whatever accretion occurred to Parcel B between 1912 and 1921 to the effects of the piers.

At this point it should be noted that the trial court also found (XI), and the evidence shows, that prior to the introduction of artificial structures such as groins, piers, and breakwaters, the beaches in Santa Monica Bay were generally in a state of equilibrium and were, and are, subject to short term changes due to seasonal fluctuations and occasional storms; that since 1875 there have been numerous structures which have interfered with the littoral drift and currents of the ocean causing portions of the shoreline to accrete, that the beach at Parcel B was generally in a state of equilibrium until 1912, subject to seasonal variations and storms, and the portion of the mean high tide line at Parcel B was also affected between 1875 and 1912 by various artificial structures, the exact extent of which effects cannot be determined due to lack of precise data (XII).

The influence of the "various artificial structures prior to 1912" (Ocean Park and Crystal Pier a distance from Parcel B, groin, railroad embankment and highway fill) is, according to Dr. Emery, "possible" or "conceivable" but the effect "is not measurable because we have no information" and "the data are so poor." They have no measurable effect, but we also "have no measurements, to speak of, for most of these effects." Mr. Dunham although noting that various deposits of material from highway construction and short groins did have an effect, testified it was minor in nature, and prior to 1912 the shoreline at Parcel B was "considered" generally stable because a natural balance of shore processes had manifested itself prior to the advent of works of man, and although man's early efforts to control the natural processes led to some change, it was "rather small" in comparison with over-all forces of nature and the amount of sand flowing past the area until 1912; and between 1912 and 1921 the effects of artificial structures became progressively predominate until at the end of the period all further advances were definitely caused by them.

Even Dr. Grant in his report conceded that the history of

construction and slow destruction along the shore is too complex and vaguely recorded to attempt a thoroughgoing consideration of the effects.

It is the ultimate facts, those to which the legal consequences attach, and not the probative or evidentiary facts which establish them, that must be found by the trial court.

A finding of ultimate fact includes a finding of all probative facts necessary to sustain it; and express findings of evidentiary facts are unnecessary. (Stanbury, California Trial and Appellate Practice, vol. I, p. 792, § 717; *Fitzpatrick* v. *Underwood*, 17 Cal.2d 722 [112 P.2d 3]; *Bloss* v. *Rahilly*, 16 Cal.2d 70 [104 P.2d 1049]; *Klein* v. *Milne*, 198 Cal. 71 [243 P. 420].) A review of the trial court's findings discloses the finding of ultimate fact, upon which that portion of the judgment here under attack rests, to be—that all accretion on the shoreline of Parcel B after 1921 was artificially caused. In support thereof we find in the record numerous findings relative to the condition of the bay, the status of the shoreline prior to 1921 and other matters, entirely probative and evidentiary in nature. It is the general rule ''that findings of probative facts will not control, limit or modify the findings of ultimate facts, or tend to establish that the ultimate facts were found against the evidence, unless the ultimate findings necessarily based on the probative findings are completely overcome.'' (*Fitzpatrick* v. *Underwood*, 17 Cal.2d 722, 727 [112 P.2d 3].) There is nothing in the record to show that the ultimate finding was based solely on the probative findings, or that the probative facts recited all of the evidence; nor do we find any material conflict or inconsistency in the probative findings. However, even if they authorized opposing, or inconsistent inferences, ''it will be assumed upon appeal that the inference made by the trial court was one that will uphold rather than defeat its judgment'' (*Estate of Berry*, 195 Cal. 354, 361 [233 P. 330]). In any event, where the evidence is sufficient to support a proper finding of the ultimate fact upon which the judgment rests, the findings of probative facts may be disregarded (*Perry* v. *Quackenbush*, 105 Cal. 299 [38 P. 740]; *American Nat. Bank* v. *Donnellan*, 170 Cal. 9 [148 P. 188, Ann.Cas. 1917C 744]; *Martinelli* v. *Luis*, 213 Cal. 183 [1 P.2d 980]); and as immediately hereinafter demonstrated, the finding that certain artificial structures were the sole cause of accretion to Parcel B since 1921, is amply supported by the evidence.

The record shows, through the testimony of Dr.

Emery, that after the Santa Monica Pier was built in 1912 a shoreline bulge developed beneath it and a fillet of sand gradually grew forward to the shore of Parcel B reaching there at some date shortly before 1921; and that after that the accretions were definitely and "100%" controlled by manmade structures. A similar conclusion was reached by Mr. Dunham—that sometime around 1920 and 1921 (the exact time he could not ascertain) a groin formed under the pier and gradually extended up to Parcel B, and "the further progradation of the beach was entirely artificial after that time (1921)." The testimony of the lay witness Leslie S. Storrs corroborated the opinions of these two experts. The evidence received through these three witnesses in itself supports the ultimate finding.

Although not specific in their designation, Dr. Grant concedes the effect of certain artificial structures ("periodic constructions of groins, piers, and other works of man") after 1933. Appellant places great reliance on his report, but Dr. Grant nowhere therein definitely asserts that the accretion between 1921 and 1933 was "natural." What conclusion he ultimately gives, he reaches through a process of reasoning based upon an "assumption" he is forced to make because of lack of data—"the assumption that the accretion of the beach at the Hecker property between 1921 and 1933 was entirely natural"—which he clearly admits "is vulnerable to challenge"; and further asserts: "as there is no way to prove that the early accretion was or was not natural, or how much was natural and how much was artificial, the assumption of a natural accretion between 1921 and 1933 forms a convenient, if *questionable* basis for projections of the trend into the future." A contrary assumption would have been as reasonable. Of interest at this point is Dr. Grant's further statement that "an early rating of natural beach progradation is unlikely to continue indefinitely in the future," because the beach would prograde "to a limit at which equilibrium is reached between constructive and destructive processes"; and the admission that his further "assumption that the rate of 'natural' accretion in the Hecker property between 1921 and 1933 would have continued without acceleration to 1955 if the breakwater had not been constructed is gratuitous," and "somewhat arbitrary." He concluded that natural accretion would have moved the high tide line no more than 142 feet beyond its 1921 position; but that opinion is based entirely upon the questionable assumptions

he chose to make because the factors resulting in the 1921 and 1933 growth to Parcel B were "obscure, illusive and indeterminate to a large degree." This opinion the trial court rejected in favor of the definite assertions of the two other experts (both eminently qualified in the field of shoreline engineering and geology and long experienced in problems involving shoreline processes in Santa Monica Bay, and who made a thorough study and analysis of numerous reports, surveys, photographs, charts, diagrams, maps, and historical data, took new measurements and made new observations) that the accretion was artificially produced; and the lack of any decisive evidence that there was any natural progradation of the shoreline from 1875.

As to the effect of the construction of the breakwater in 1934, Dr. Emery attributed the largest effect to it because it was a more effective sand trap, and after it was built the bulge progressed greatly and sand accumulated on the upstream side of the bulge and built out the beach in front of Parcel B; and the breakwater so altered the trend of the beach it had to be considered the cause of all subsequent accretions. This, too, is borne out by the Corps of Engineers Report (Ex. 83) that the breakwater caused the shore to advance and, between 1934 and 1946, amounted to 314 feet opposite its up-coast end. Both experts described the effect of the artificial structures and the method by which they cause accretion—whereby the sand it either trapped by the structure or deposited as the result of the decreased velocity of the current caused by it.

Any contention that accretion to Parcel B after 1921 should be regarded as "natural" finds support neither in the record before us, which establishes that it was caused by artificial structures such as groins, piers, and breakwaters, nor in the law of this state. The oceanografic and geologic process whereby accretions were formed in *Carpenter* v. *City of Santa Monica*, 63 Cal.App.2d 772 [147 P.2d 964], and *Los Angeles Athletic Club* v. *City of Santa Monica*, 63 Cal.App.2d 795 [147 P.2d 976], was identical to that causing the accretion to Parcel B herein, involving the same groins, Santa Monica and amusement piers, and breakwater. The holdings in these two cases make it clear that the accretions caused by those structures are properly classified as entirely artificial.

Relative to the issue of title, appellant asserts that Parcel B consists of alluvion in the nature of submerged lands; and that although the state acquired ownership of

submerged lands along its coasts from the federal government under the Submerged Lands Act of 1953, inasmuch as the federal law gives accretion to the upland owner, Parcel B did not pass to the State of California under that grant. We find no merit to this position for Parcel B, consisting of artificial accretion, constitutes tideland and, as tideland, title thereto vested in the state upon its admission to the Union in 1850.

It is conceded by appellant that tidelands are those lands covered and uncovered by the daily flux and reflux of the tides; submerged lands those lying oceanside of the tidelands (A.C.B., p. 18). Although Parcel B was once inundated by the ebb and flow of the tide, it now consists entirely of artificial accretion resulting from the effects and influence of manmade structures. It does not attach as alluvion to the ownership of the upland, but retains its character as public land in the nature of tideland. (*City of Los Angeles* v. *Anderson,* 206 Cal. 662, 667 [275 P. 789]; *Patton* v. *City of Los Angeles,* 169 Cal. 521, 525 [147 P. 141].)

Appellant submits that the state must rely for its title upon a federal grant under the Submerged Lands Act, which is controlled by federal decisions compelling the conclusion that the accretion belongs to the owner of the upland. This is not the fact for the state has owned its tidelands since its admission to the Union (*Borax Consolidated* v. *City of Los Angeles,* 296 U.S. 10 [56 S.Ct. 23, 26, 80 L.Ed. 9]), and its ownership is neither dependent upon, nor derived through, the Submerged Lands Act of 1953. ██ It has been established by a long line of authority that "(T)he soils under tidewaters within the original states were reserved to them respectively, and the States since admitted to the Union have the same sovereignty and jurisdiction in relation to such lands within their borders as the original States possessed." (*Borax Consolidated* v. *City of Los Angeles,* 296 U.S. 10, 15 [56 S.Ct. 23, 26, 80 L.Ed. 9]); and that a state upon admission acquires absolute title in and dominion over all soils under navigable waters, including tidelands, subject only to a public trust for navigation, commerce, and fishing (*Knight* v. *United Land Assoc.,* 142 U.S. 161 [12 S.Ct. 258, 35 L.Ed. 974]; *The Abbey Dodge* v. *United States,* 223 U.S. 166 [32 S.Ct. 310, 56 L.Ed. 390]; *Shively* v. *Bowlby,* 152 U.S. 1 [14 S.Ct. 548, 38 L.Ed. 331]). "This doctrine applies to tidelands in California. . . . It follows that if

the land in question was tideland, the title passed to California at the time of her admission to the Union in 1850. That the Federal Government had no power to convey tidelands which had thus vested in a State, was early determined." (*Borax Consolidated* v. *City of Los Angeles, supra,* 15, 16.) The Supreme Court in *United States* v. *California,* 332 U.S. 19 [67 S.Ct. 1658, 91 L.Ed. 1889], involving a controversy between federal and state government of ownership of interest in submerged lands (as distinguished from tidelands), conceded in its opinion that ". . . California has a qualified ownership of lands under inland navigable waters such as rivers, harbors and even tidelands down to the low water mark . . ." (p. 31).

In 1953, the Submerged Lands Act was passed which provided in subdivision (a) "It is determined and declared to be in the public interest that (1) title to and ownership of the lands beneath navigable waters within the boundaries of the respective states, and the natural resources within such lands and waters, and (2) the right and power to manage, administer, lease, develop, and use the said lands and natural resources all in accordance with applicable state law be, and they are, subject to the provisions hereof, recognized, confirmed, established and vested in and assigned to the respective states. . . ." Under subdivision (b), the United States "releases and relinquishes" to the states "all right, title and interest of the United States, if any it has, in and to all said lands. . . ." (43 U.S.C. § 1311, chap. 29.) "Lands beneath navigable waters" are defined in the act and include " (2) all lands permanently or periodically covered by tidal waters up to but not above the line of mean high tide and seaward to a line three geographical miles distant from the coastline of each such state. . . ." (§ 1301(a).)

It is obvious from the language used in the act that Congress intended thereby only to declare that title to tidelands already vested in the state be "recognized" and "confirmed." Thus, the court in *Superior Oil Co.* v. *Fontenot,* 213 F.2d 565, in 1954, construed the act either as confirming title to tidelands in the state which it at all times had, or if it were regarded as conferring title, the title so conferred related back so as to confirm and maintain possession and title of the state as good from the beginning. The terms "grant" or "convey" are not employed in section 1311; and considering the status of submerged lands prior to the act (*City of Oakland* v. *Buteau,* 219 Cal. 745 [29 P.2d 177]),

even as to them, the act could not serve as a grant as urged by appellant—but at most amounted to a quitclaim from the federal government to the states (*Bailey* v. *Driscoll* (1955), 19 N.J. 363 [117 A.2d 265]; *Bowes* v. *City of Chicago* (1954), 3 Ill.2d 175 [120 N.E.2d 15]).

Urging the applicability of federal law, appellant cites numerous federal cases supporting the rule giving accretion to the upland owner. Although the state's title to the tideland was not derived from, or dependent on, the Submerged Lands Act, it is in point to mention that title according to the terms of the act is to be determined in accord with the state, not federal law; and under California law, as between the state and upland owner, artificially caused accretion belongs to the owner of the tidelands and not to the littoral owner. The act determined and declared title to, and ownership of, the lands and natural resources thereto and the right to develop and use the same "all in accordance with applicable state law" (§ 1311, subdivision (a) 1, 2); and recognized, confirmed, established, vested and assigned title and ownership thereof to the respective states or persons, who on June 5, 1950, were "entitled thereto under the law of the respective states in which the land is located." This provision follows the general rule applying local law to questions of title between the state and riparian owners (*Archer* v. *Greenville Sand & Gravel Co.*, 233 U.S. 60 [34 S.Ct. 567, 58 L.Ed. 850]; *Iowa* v. *Carr*, 191 F. 257).

Relying upon the federal and common-law rule that accretion accrues to the upland owner even though assisted by artificial means, appellant submits that under section 22.2, Civil Code, it shall be the rule of decision in California courts. The law of this state does not support such a position. The within controversy is between the littoral owner and the state, and as such the rule urged by appellant does not apply. In this kind of controversy it is well established in California "that accretions formed gradually and imperceptibly, but caused entirely by artificial means—that is, by the works of man, such as wharves, groins, piers, etc., and by the dumping of material into the ocean—belong to the state or its grantees and do not belong to the upland owner" (*Carpenter* v. *City of Santa Monica*, 63 Cal.App.2d 772, 794 [147 P.2d 964]). The Carpenter case, *supra*, and *Los Angeles Athletic Club* v. *City of Santa Monica*, 63 Cal.App.2d 795 [147 P.2d 976], decided the same day, involve artificial accretion to the Santa Monica shoreline resulting from the

same structures, groins, piers, etc., which caused the accreted land of Parcel B herein. The trial court in both made findings of fact similar to those at bar and ultimately found, as here, that the beach in question had been artificially created by manmade structures. In *Carpenter* v. *City of Santa Monica,* 63 Cal.App.2d 772 [147 P.2d 964], the grantee of tide and submerged lands from the state constructed a breakwater causing erosion of the beach in front of plaintiff's property, for which he sued, claiming ownership thereof. After a careful examination of California authorities and full discussion of public policy considerations in the law of artificial gains (p. 794), the court pronounced the rule in this state. Likewise the court in *Los Angeles Athletic Club* v. *City of Santa Monica,* 63 Cal.App.2d 795 [147 P.2d 976], rejected the contention that the artificial accretion antedating the breakwater belonged to appellant as the upland owner, and held that the artificially accreted area belonged to the city as the grantee of the state.

The prevailing rule in California emerged from a series of cases involving controversies between the state or its successors in interest and the upland owner, beginning with *Dana* v. *Jackson Street Wharf Co.,* 31 Cal. 118 [89 Am.Dec. 164], wherein plaintiff claimed ownership of land gradually accreted by reason of a wharf built by defendant upon the area in dispute and which the latter used for landing vessels. The court distinguished between marine increase by alluvion and that caused by artificial means, declared the accretion belonged to the "crown" (state); and giving several independent reasons for its decision, held against plaintiff. Throughout the years this case has been cited for the proposition that accretion resulting from artificial means does not inure to the benefit of the upland owner, but the right to recover possession thereof is in the state or its successor in interest (*City of Los Angeles* v. *Anderson,* 206 Cal. 662 [275 P. 789]; *Carpenter* v. *City of Santa Monica,* 63 Cal.App.2d 772 [147 P.2d 964]; *City of Newport Beach* v. *Fager,* 39 Cal.App.2d 23 [102 P.2d 438]; *Forgeus* v. *County of Santa Cruz,* 24 Cal. App. 193 [140 P. 1092]). And supporting this early holding is *Patton* v. *City of Los Angeles,* 169 Cal. 521 [147 P. 141], wherein the Southern Pacific Railroad, a licensee of the state, built an embankment along its line leading from the mainland across a part of San Pedro Bay. Plaintiff, suing to quiet title to certain land, claimed that a portion of the area ceased to be tideland because of an accretion caused by the

embankment. It is clear from a reading of the opinion therein that the court was concerned not only with the artificial embankment, but accretions caused thereby (p. 525). (*Carpenter* v. *City of Santa Monica*, 63 Cal.App.2d 772, 790 [147 P.2d 964].) The court, holding that reclaimed tidelands and accretions to adjacent lands caused thereby belonged to the state or its grantees, said at page 525: ". . . no artificial embankment, made by third persons, or made or suffered by state officers or agents, nor any accretion to the adjacent upland caused thereby could operate to divest the state of its title to the tideland so reserved." (*Patton* v. *City of Los Angeles, supra,* 169 Cal. 521.) *City of Los Angeles* v. *Anderson,* 206 Cal. 662 [275 P. 789], cited by appellant as declaring "that the common law of alluvion was the law of California" (App. O.B. p. 44) and holding that reference to "natural causes" therein to be in line with the common law rule that "accretions resulting from groins were 'natural' " (*Brighton & Hove* v. *General Gas Co.,* 1 Ch. 372) (App. O.B., p. 45), holds nothing of the kind—in fact, the Anderson case constitutes persuasive authority in the case at bar. The court therein actually based its decision on two theories "either the accretions involved were not gradual, or if they were, they were artificial. In either event, says the court, they belong to the state or its grantees. . . ." (*Carpenter* v. *City of Santa Monica,* 63 Cal.App.2d 772, 790 [147 P.2d 964].) In accord is *City of Newport Beach* v. *Fager,* 39 Cal.App.2d 23 [102 P.2d 438], involving reclaimed tidelands, reiterating the general rule that accretions added to upland by artificial means do not inure to the benefit of the littoral owner but remain in the state.

Appellant seeks to explain away these decisions by recognizing them only as "deviating decisions" with "peculiar circumstances" that distinguish them from the instant case. The "peculiar circumstances" constitute the very factor which created the prevailing rule in California, departing from the common law and which has become decisive in a controversy between the state and upland owner. ▮ Inasmuch as we have rejected appellant's claim that decisions of federal courts are here controlling and, in any event, the common-law rule of alluvion prevails in the case at bar, we deem it unnecessary to further consider the applicability of these cases, or other issues arising out of constitutional provisions and public policy, which have long before been considered by our courts in the cases hereinbefore cited.

In conclusion appellant urges that as littoral owner he possesses a special and vested right of access to the sea—a frontage right separate from the land, which is compensable. The record before us establishes, and the trial court has found, that Parcel B, consisting of tideland artificially created and owned by the state, stands between land owned by appellant and the sea, separating him from contact with the latter. Whatever littoral rights he may have had were extinguished when the shoreline was artifically built up through the effect of groins, piers, and breakwaters constructed in relation to, and in furtherance of, the public trust with which the tideland was impressed (*City of Long Beach* v. *Marshall,* 11 Cal. 2d 609, 614 [82 P.2d 362]; *Henry Dalton & Sons Co.* v. *Oakland,* 168 Cal. 463, 465 [143 P. 721]), and when the state began to carry out its plan for improvement and general development of the beach front. (*City of Newport Beach* v. *Fager,* 39 Cal.App.2d 23 [102 P.2d 438]; *Boone* v. *Kingsbury,* 206 Cal. 148 [273 P. 797].)

Rejecting a similar complaint that appellant was cut off from contact with the sea, the court in *Los Angeles Athletic Club* v. *City of Santa Monica,* 63 Cal.App.2d 795, stated at page 799 [147 P.2d 976]: "It is well settled that the littoral rights of an upland owner who owns no title to tidelands adjoining his property are subject to termination by whatever disposition of the tidelands the state, or its grantees, in the exercise of their trust, choose to make," citing numerous cases including *City of Newport Beach* v. *Fager,* 39 Cal.App. 2d 23 [102 P.2d 438]. In the latter case, after considerable discussion and review of the law relative to littoral rights, the court disposed of the contention that appellants were entitled to the right of access to the water over the land in question on the theory that before the land was reclaimed their lots abutted the ocean: "We are satisfied that the correct rule is that the littoral owner of uplands upon a navigable bay has no right of access to the waters of the bay over intervening tide lands, whether filled or unfilled, which have been granted by the state to a city in trust for the purpose of improving such navigable bay in furtherance of commerce and navigation (citations). Although it is true that as against a stranger a littoral owner of upland bordering upon navigable waters may not be deprived of his right of access to such waters, no such right exists in favor of such littoral owner as against the state or its grantee in the exercise of a lawful use or purpose. (Citations.)" (39 Cal.App.2d 23, 28 [102 P.2d 438]).

In dredging the bay and filling the tidelands the city there was carrying out a plan for the general development of the bay as a harbor and at the same time improving the harbor front. The street construction facilitated easy access to the waters of the bay and the court held that all improvements were in furtherance of the purposes for which the city held the land in trust. The court disclaimed any view that appellants were deprived of their property rights without due process and compensation and said at page 31: "It must be borne in mind, however, that the littoral rights of an upland owner who does not own title to the submerged land or tide land in front of his property are, under the law in this state, subject to being terminated at will by any disposition which the state may choose to make of such submerged lands or tide lands. (Citations.) Defendants as littoral owners are being deprived of no property right since their right of access over the intervening tide lands to navigable water was a qualified right at all times subordinate to the paramount right of the state in which title to such lands was vested. No right of action exists in favor of a littoral owner whose right of access over the tide lands to navigable waters has been cut off by the disposition which the state has made of such tide lands (citation)."

 It is well settled that although the sovereignty of the state over tidelands does not deprive the littoral owner of his right of access from his own land to the ocean as against a stranger, "this right is not given to the owner of land bordering upon the ocean shore as against the state or its grantee in the exercise of a lawful use or purpose." (*Boone* v. *Kingsbury,* 206 Cal. 148, 170 [273 P. 797].)

 Appellant argues that the state seeks to condemn the land for a state park, not consistent with its rights and duties under its public trust to promote navigation, commerce and fishing. Tidelands may be devoted to any use not inconsistent with the public trust (*City of Long Beach* v. *Marshall,* 11 Cal.2d 609 [82 P.2d 362]; *Mallon* v. *City of Long Beach,* 44 Cal.2d 199 [282 P.2d 481]; *Taylor* v. *Continental Southern Corp.,* 131 Cal.App.2d 267 [280 P.2d 514]); and although we question appellant's right to complain of any disposition made by the state of its tideland, we deem neither the construction of piers, groins and breakwaters improving the harbor, nor improvements by way of a public park to develop the beach area, to be violative of the public trust subject to which

the state holds the land. It has been held that tidelands devoted to state purposes (*City of Newport Beach* v. *Fager*, 39 Cal.App.2d 23 [102 P.2d 438]), prospecting for and extracting minerals (*Boone* v. *Kingsbury*, 206 Cal. 148 [273 P. 797]), harbor improvement structures (*Koyer* v. *Miner*, 172 Cal. 448 [156 P. 1023]), and so on, raise no right of redress in the upland owner.

 The proposed improvement of the beach by the state rightfully cuts off access from appellant's land to the ocean and as he had no littoral right by virtue of his ownership of the upland nor any other right to the tidelands, it follows that he cannot be heard to complain of any disposition made by the state of such tideland. In the case of *Henry Dalton & Sons Co.* v. *Oakland*, 168 Cal. 463 [143 P. 721], the court held that the only littoral right which plaintiff had by virtue of his ownership of the upland was the right of access to the waters of the bay, and that since this sole incident of littoral ownership had been rightfully terminated by the harbor front improvement, plaintiff had no right to question the use to which the state was devoting such tidelands. Again in *Koyer* v. *Miner*, 172 Cal. 448, the court stated at page 453 [156 P. 1023]: "(t)he only interest he had therein was rightfully terminated by the harbor improvements and as a private citizen he had no right to question the use to which the state was devoting such tidelands. . . ."

 We have held that appellant, the littoral owner of the upland, has no right of access to the ocean over the intervening tideland constituting Parcel B as against the State of California. If any access exists it is against a stranger which would be enforceable only if the latter trespassed or threatened to do so. Since it is well settled that valuation in an eminent domain proceeding is based solely upon market value (*People* v. *Vinson*, 99 Cal.App.2d 100 [221 P.2d 161]; *People* v. *Ricciardi*, 23 Cal.2d 390 [144 P.2d 799]), it is clear that unless the claimed right of access has some pecuniary value, no compensation is allowed for its taking. We deem the limited right here enforceable too remote for consideration since it would be so speculative as to be incapable of estimate. Such speculative, remote and nominal rights are noncompensable in a condemnation proceeding (*Muller* v. *Southern Pac. Branch Ry. Co.*, 83 Cal. 240 [23 P. 265]; *San Gabriel* v. *Pacific Elec. Ry. Co.*, 129 Cal.App. 460 [18 P.2d 996]; *Southern Pac. R. R. Co.* v. *San*

*Francisco Savings Union,* 146 Cal. 290 [79 P. 961, 106 Am. St.Rep. 36, 2 Ann.Cas. 962, 70 L.R.A. 221]).

For the foregoing reasons the judgment is affirmed.

Wood, P. J., and Fourt, J., concurred.

A petition for a rehearing was denied May 9, 1960, and appellant's petition for a hearing by the Supreme Court was denied June 8, 1960.