[Civ. No. 25615. Second Dist., Div. Two. Feb. 9, 1962.]

FLOYD J. KRAMER et al., Plaintiffs and Appellants, v. STATE BOARD OF ACCOUNTANCY, Defendant and Respondent.

Ball, Yudelson, Brown & Di Giuseppe for Plaintiffs and Appellants.

Stanley Mosk, Attorney General, Lynn Henry Johnson and Warren B. Deering, Deputy Attorneys General, for Defendant and Respondent.

FOX, P. J.—This is a mandate proceeding. An amended accusation was filed before the State Board of Accountancy against Floyd J. Kramer, individually, and Kramer and Zucker, a copartnership consisting of Floyd J. Kramer and Marshall Zucker,[1] charging in effect (so far as here pertinent) that appellants[2] had prepared certain balance sheets for a client, stamping thereon "Prepared from Books of Accounts,"[3] although they knew they were not prepared from the books of accounts of the company; and that they delivered such balance sheets to the client. It was also charged that the last of these balance sheets did not reveal a bank overdraft of $114,157.68 which was shown on said books of accounts.

The hearing officer found these charges to be true and recommended revocation of (1) Kramer's certificate and (2) the permit of Kramer and Zucker, a copartnership, to practice accountancy for violation of sections 5100, subdivision (d) and 5101, respectively, of the Business and Professions Code (dishonesty in the practice of public accountancy). The hearing officer's proposed decision and recommendation was adopted by the board as its decision and ordered into effect immediately.

Appellants filed their petition in mandate to annul the decision and order of the board. The trial court sustained the decision on all of the above-mentioned charges except with respect to the bank overdraft. As a consequence the court remanded the proceedings to the board for reconsideration of the penalty. It also ordered each party to bear his own costs.

Appellants have appealed, contending for various reasons, that the decision of the board should have been annulled in its entirety, and that they should have been awarded their costs.

During 1952 through 1954, the appellants were accountants for William Frank and William Goldberg, doing business as Encanto Electric Shop (hereafter referred to as Encanto). The principal offices of this business were in San Diego.

Appellants prepared for Encanto a balance sheet purporting to set forth its financial condition as of November 30, 1953, as

---

[1]Mr. Zucker personally was not accused of any professional misconduct in these proceedings.

[2]Kramer and the partnership will, for the sake of convenience, be referred to as appellants.

[3]The complete legend reads, "Prepared from Books of Accounts without independent verification." The legend on one of the balance sheets reads: "Prepared from Books of Accounts without independent verification of inventory and receivables."

shown by the books of accounts. They knew that this balance sheet was to be submitted to an insurance company for the purpose of obtaining a bond. The balance sheet showed the capital of Frank to be $37,889.83, while the books of accounts placed it at $17,889.83. The balance sheet recorded the capital of Goldberg as $39,139.50, while the books of accounts revealed it to be $17,239.78. The balance sheet carried the legend that it was "prepared from Books of Accounts without independent verification." According to generally accepted accounting procedures, as testified to by Mr. Norberg, an accounting expert, one would normally expect the figures given on the balance sheet to be the same as the figures found in the general ledger.

According to this same expert, the general ledger of a business concern is a summary book in which is summarized the information found in all of the daily journals and transactions of the company. In preparing financial statements from books of accounts, the accountant normally relies on the general ledger as a summary book. However, sometimes adjustments to the books of accounts are made upon the accountant's working papers for the purpose of preparing the statement. Normally the books are corrected as of the end of the year to reflect the adjustments.

The expert also testified there was an accounting definition of books of accounts. He gave it in these terms: "The definition consists normally of the books of original entry which would be the types of books that are used to record the day-to-day transactions such as the cash receipts journal, the purchases journal, the sales journal, the check register, the payroll journal and perhaps a general journal which might pick up other transactions not recorded in those particular books of original entry, and those books are generally posted to a general ledger which is a summary book that contains the summary of the accounts. Now, . . . that definition of books of account can be expanded in reasonable terminology to mean the books of the company that go to support the financial status of the company. Ordinarily, when the term is used it is confined to the first group of accounts that I mentioned, but it can be expanded——." Kramer agreed with this definition.

Appellants also prepared for Encanto a balance sheet purporting to give the condition of the business as of December 31, 1953, as shown by the books of accounts. As in the case of the previous balance sheet, appellants knew it was to be submitted to an insurance company for the purpose of obtain-

ing a bond. It too bore the notation that it was "prepared from Books of Accounts" but "without independent verification of inventory and receivables." This balance sheet sets forth $141,815.46 as "Inventory and Work in Progress"; $172,534.43 as "Accounts Receivable, Contracts"; $44,019.46 as capital of Frank and $45,689.92 as capital of Goldberg. However, the general ledger of Encanto as of December 31, 1953 showed $92,133.80 for work in progress and $66,815.46 for raw materials inventory. The sum of these two accounts is $158,949.26. The general ledger also gave a figure of $105,-400.63 for "Accounts Receivable Contracts, New"; a figure of $19,019.95 for capital of Frank and $18,783.12 for capital of Goldberg.

Finally, appellants prepared a balance sheet for Encanto purporting to give the condition of the business as of September 30, 1954, as shown by the books of accounts. It, like the others, bore the notation that it was "prepared from books of accounts." On this balance sheet appellants stated the value of the capital stock of Frank to be $32,752.89 as of January 1, 1954 although the general ledger recorded the value of his stock as $19,019.95. The balance sheet placed the value of Goldberg's stock at $34,441.30 as of the same date although the general ledger showed it to be $18,783.12. The capital at the end of one year is the beginning capital for the next year.

Harvey Jensen was the credit manager of Electric Supplies Distributing Company in San Diego. The company represented by Mr. Jensen had extended credit to Encanto. The last balance sheet for Encanto that this company had received was in 1951. Prior to receiving the balance sheet of September 30, 1954, Jensen had asked Frank several times for a financial statement and finally had become quite insistent about receiving one. In fact, Jensen and Frank met with Kramer in the latter's office to discuss preparation of the balance sheet of September 30. This was a lengthy conference and both Frank and Jensen asked Kramer to prepare the statement.

At the hearing, Kramer's attention was directed to the difference between the figures for the capital accounts of Frank and Goldberg as disclosed by the balance sheet of November 30, 1953, and as set forth in the general ledger. Kramer explained that the difference was caused by a $40,000 item of work in progress that was given to him by Encanto's bookkeeper, plus an item of $1,899.81 that he picked up from the ledger and added to Frank's account to balance a like item previously credited to Goldberg. Kramer testified that

work in progress, which was never part of the books of the business, existed at all times.

Kramer's attention was also directed to the fact that on the balance sheet of December 31, 1953 he placed accounts receivable at $172,534.43 which was $67,133.80 higher than the figure shown in the general ledger ($105,400.63). Kramer explained this by saying that on December 31, 1953 Encanto had $67,133.80 in completed contracts which were not entered on the books until January of 1954. He then pointed to a pencil entry in the sales journal which he said had been placed there by Encanto's bookkeeper. Kramer's position was that this supported his adding the last mentioned amount to the accounts receivable for the previous year. He stated that this was the only place where a notation as to this item was to be found in the books. The bookkeeper was not called to testify.

Kramer's attention was also directed to the fact that the balance sheet of December 31, 1953 lists inventory and work in progress $17,133.80 [($92,133.80 + $66,815.46) — $141,-815.46] lower than the ledger figure, and the capital of Frank as $25,000.01 ($44,019.96 — $19,019.95) higher than the ledger figure. Kramer stated that he could not explain this difference until he made a recomputation and that this was also true as to Goldberg's capital account which appeared on the balance sheet as $26,899.80 ($45,682.92 — $18,783.12) higher than the ledger figure. The recomputations were introduced in evidence as Exhibits 9 and 10. Exhibit 9 shows a reduced estimate of work in progress from $92,133.88 to $75,000. Nowhere on Exhibit 10 are the balance sheet figures as of December 31, 1953, of the Frank and Goldberg capital accounts reconciled with the figures set forth in the general ledger for said date.

On cross-examination Kramer testified that the figures he placed on Exhibit 10 in the column headed "General Ledger" were not taken from the general ledger but were what the general ledger would have shown had it included $40,000 of work in progress which was left out.

Kramer sought to explain the difference between the figures for the capital accounts of Frank and Goldberg as set forth on the balance sheet of September 30, 1954 and the corresponding items in the general ledger by reference to certain adjusting entries in the books plus a reference to work in progress that was not reflected in the general ledger.

The decision of the board contained the figures herein mentioned and revealed the discrepancies between the three bal-

ance sheets and the corresponding items in the general ledger. The decision also states that appellants knew that the balance sheets of November 30, 1953, and of September 30, 1954, did not correctly reflect the capital accounts of Frank and Goldberg as recorded in the books of accounts and were not "prepared from Books of Accounts" as represented by appellants on said balance sheets. As to the balance sheet of December 31, 1953, the decision of the board states that said balance sheet did not correctly reflect the inventory and work in progress, the capital accounts of Frank and Goldberg, and the accounts receivable contracts, as then recorded in the books of accounts and appellants knew that said balance sheet was not "prepared from Books of Accounts" as represented by appellants on said balance sheet.[4] The foregoing portions of the board's decision were found by the trial court to be supported by the weight of the evidence introduced at the board hearing. The court concluded, *inter alia,* that the board did not act in excess of its jurisdiction, that the appellants received a fair trial at the administrative hearing, that the board in making its decision proceeded in the manner required by law, and that the board did not abuse its discretion in finding the facts summarized above.[5]

In seeking a reversal, appellants contend that the evidence is insufficient to support the judgment. The thrust of their attack is that the evidence does not establish that they had committed acts of dishonesty in the practice of public accountancy. It is thus apparent that their basic contention is that the evidence is insufficient to support the findings of fact upon which the judgment rests. ▮▮ In passing on this question it must be borne in mind that "[a]ll of the evidence most favorable to the respondent must be accepted as true, and that unfavorable discarded as not having sufficient verity to be accepted by the trier of fact." (*Estate of Teel,* 25 Cal.2d 520, 527 [154 P.2d 384].) ▮ Also, when a different inference reasonably can be drawn from the evidence, the reviewing court is without power to substitute its deductions for those of the trier of fact. (*Estate of Moore,* 143 Cal.App.2d 64, 67 [300 P.2d 110].) ▮ It is also to be noted that

---

[4]From the foregoing facts found by the board in its decision, the board concluded that appellants had committed acts of dishonesty in the practice of accountancy which were cause for disciplinary action against them under §§ 5100, subd. (d) and 5101 of the Business and Professions Code.

[5]It will be recalled that the court exonerated appellants from the charge that they knowingly failed to reveal the bank overdraft.

"[i]n passing on the credibility of witnesses and the weight to be given their testimony, the trier of fact is entitled to consider their interest in the result of the case, their motives, the manner in which they testify, and the contradictions appearing in the evidence." (*Huth* v. *Katz*, 30 Cal.2d 605, 609 [184 P.2d 521]; *Kraut* v. *Cornell*, 175 Cal.App.2d 528, 532 [346 P.2d 438].) ■ Viewing the evidence in the light of these principles, it is apparent that appellants understood that the balance sheets of November 30 and December 31, 1953, were to be submitted to an insurance company for the purpose of obtaining bonds and that the balance sheet of September 30, 1954, was to be used by Encanto in connection with its credit arrangements with Electric Supplies Distributing Company; that the balance sheets showed the capital of both Frank and Goldberg to be different from their capital as reflected by the general ledger of the company; that the balance sheet of December 31, 1953 showed inventory and work in progress and accounts receivable to be different from the figures in the books of accounts for these respective items; that the balance sheets carried the notation that they were "prepared from Books of Accounts" of Encanto.

Mr. Norberg, the expert in accounting procedures, testified that according to generally accepted accounting procedures, one would normally expect to find in the general ledger of the company the figures that appeared on the balance sheets. He examined the general ledger of Encanto and testified that none of the figures appearing in the balance sheets could be found in the general ledger and that the figures mentioned herein as appearing on the balance sheets should have corresponded with the figures for the same items in the general ledger. He gave the board the correct figures as per the general ledger for the various items on the balance sheets here in question.

Kramer sought to explain the difference between his balance sheet figures and the general ledger figures by various estimates of work in progress which he said were given to him verbally by representatives of Encanto but which were not reflected in the books of accounts. He testified, for example, that he had received an estimate of $40,000 for work in progress which existed as of *December 31, 1952*; that no such item appeared in the general ledger but that he included this entire amount in the balance sheet of November 30, 1953; that this was the reason why the capital of Frank and Goldberg was $40,000 higher on his November 30, 1953, balance sheet

than it was on the general ledger. On cross-examination he was shown the balance sheet of December 31, 1952, where he had placed the capital of Frank and Goldberg only $18,000 higher than the ledger figure instead of using the $40,000 figure. He explained this by saying that for the balance sheet of December 31, 1952, he showed only the increase in the work in progress for 1952 rather than the full amount.

On a statement of income and expense for December 31, 1953, Kramer raised the opening inventory $40,000 and explained this by reference to a $40,000 item of work in progress which was never a part of the books. As a part of a tax return Kramer also prepared a statement of income and expense as of the last mentioned date and on this statement he gave the opening inventory at exactly the ledger figure, that is, without the $40,000 addition to that figure. Kramer testified that there was a consistent figure of $40,000 worth of work in progress not reflected in the books; that this figure ran all through the balance sheets in question. However, on the balance sheet of September 30, 1954, it developed after computations that only $30,000 remained unexplained. So, as to this particular balance sheet Kramer testified it reflected $30,000 of unrecorded work in progress. He further testified that the ending capital as of December 31, 1953, which would be the same as the beginning capital of the new year, included $40,000 worth of work in progress. However, he also testified that the beginning capital as of January 1, 1954, included only $30,000 of work in progress.

Kramer stated there is no generally accepted accounting principle for the handling of work in progress, that it in no way distorts the financial picture to call work in progress "raw materials" and that normally it makes no difference to a creditor if the work in progress is called raw materials. However, Norberg pointed out that work in progress is material and labor committed to production and is in contrast to raw material which is material not committed to production. Norberg further pointed out that normally one would not expect to find work in progress under the classification of raw materials; also that on the balance sheet and profit and loss statement of September 30, 1954, it would have made a material difference to a creditor if $30,000 worth of work in progress which Kramer claimed existed had been shown as such and not as raw materials. It would have shown inventory going up while the work being performed went down.

In view of the wide disparity between the figures shown on

the balance sheets prepared by Kramer and those to be found in the books of accounts of Encanto with respect to the capital stock of the owners, inventory, accounts receivable and work in progress; the manner in which work in progress was made use of in the various balance sheets; the failure of Kramer to satisfactorily explain the numerous discrepancies; the placing of figures on the balance sheets which he knew could not be found in the books of accounts; his knowledge that the information placed on the balance sheets did not correctly reflect the information in the books of accounts and his knowledge that the legend placed on the balance sheets "prepared from books of accounts" was untrue—all these reasonably justified the trier of fact in drawing an inference (even a number of inferences) that Kramer acted dishonestly in the preparation of these balance sheets and therefore, violated section 5100, subdivision (d) of the Business and Professions Code. It is apparent that the findings are supported by the weight of the evidence and that the court did not abuse its discretion. To reach the conclusion on the evidence for which appellants contend, it would be necessary for us to reevaluate the credibility of the witnesses, draw inferences contrary to those drawn by the trier of fact and reweigh the evidence. Under established principles of appellate practice, a reviewing court is not at liberty to do this.

Appellants argue that the findings of fact and conclusions of law are improper and deficient. They claim, for example, that certain of the findings of fact are not such but actually conclusions of law; also, that certain of the findings are deficient in that they do not set out additional material. There is no substance in these arguments. They also claim that the findings do not show that the trial court independently weighed the evidence that was before the administrative board. On this point, Finding 2 states that the findings of fact of the State Board of Accountancy are ". . . supported by the weight of the evidence introduced at said hearing." It seems implicit in this finding that the trial court did independently weigh the evidence that was introduced before the board. They also point out that the court did not expressly state that what was in fact done constituted dishonesty. But again, it is implicit in the findings that the court made and the action it took that it regarded the acts with which appellants were charged, and which the evidence shows they committed, were sufficient to support the inference of dishonesty, and pointed unerringly in that direction.

 Appellants claim that certain procedures adopted in this proceeding were improper. It is not claimed that statutory requirements were not met, but that the proceedings fell short of the due process standard. When the original accusation was filed, concerning the balance sheet of September 30, 1954, the board's investigator had conferred with appellant Kramer concerning complaints, had written him inviting him to write a letter of explanation to the board, and had furnished a report to the board. Based on this report the board determined that a violation had occurred and referred the matter to the Attorney General's office to have an accusation drafted. This procedure was not followed with respect to the amended accusation, which contains additional offenses. No report was made to the board prior to the amending of the accusation. It is claimed that the board as a body should have had submitted to it the evidence on which the additional charges were based to determine whether the amended accusation should have issued.

Section 11503 of the Government Code makes no such requirement. It permits an accusation to be made by a public officer or an employee of the agency, and it is not disputed that the board's investigator qualifies. Furthermore, "An accusation by an agent of the board is just as much an accusation by the board as is a direct accusation by the board." (*Hohreiter* v. *Garrison,* 81 Cal.App.2d 384, 393 [184 P.2d 323].)

 It is further contended that the board's action in adopting the proposed decision of the hearing officer without familiarizing itself with the evidence on which the proposed findings were based, and without affording appellants an opportunity to appear before it to argue and present additional evidence was a denial of due process. Section 11517, subdivision (b) of the Government Code reads in part: "If a contested case is heard by a hearing officer alone, he shall prepare a proposed decision in such form that it may be adopted as the decision in the case. . . . The agency itself may adopt the proposed decision in its entirety. . . ." In *Hohreiter* v. *Garrison, supra,* it was held that, properly interpreted, this means that the administrative agency may adopt the proposed decision without reading or otherwise familiarizing itself with the record, and this is not a violation of due process. (81 Cal. App.2d 384, 395-401.) This decision was followed in *National Auto & Cas. Ins. Co.* v. *Industrial Acc. Com.,* 34 Cal.2d 20, 28 [206 P.2d 841]; and *Dami* v. *Department of Alcoholic*

*Beverage Control,* 176 Cal.App.2d 144, 151-152 [1 Cal.Rptr. 213]. The contention that appellants should have been permitted to appear before the board and present additional arguments was also disposed of in the *Dami* case, *supra.*

The *Hohreiter* and *Dami* courts were faced with substantially the same arguments as are made here. The former, at page 402, stated that "the ultimate power of decision rests with the trial court. That court decided this case upon the full record. . . . Due process contemplates that somewhere along the line a fair trial be had—not that there be two or three fair trials. . . . [A]ppellant having had a fair and impartial trial before a superior court, is in no position to contend he has not been afforded due process." And the latter, at page 151: "Due process cannot become a blunderbuss to pepper proceedings with alleged opportunities to be heard at every ancillary and preliminary stage, or the process of administration itself must halt. Due process insists upon the opportunity for a fair trial, not a multiplicity of such opportunities."

Following the presentation of the board's case in chief, appellants moved to dismiss the proceedings on the ground that a prima facie case had not been established. The hearing officer held that no power lay in him to dismiss the case and denied the motion. Appellants contend that they were thereby required to rebut unsupported charges and thus denied due process. Their argument is not well taken. This question was disposed of in *Frost* v. *State Personnel Board,* 190 Cal.App.2d 1 [11 Cal.Rptr. 718] (Hearing denied.). It was there held that where the hearing officer alone hears the case, he may not entertain motions in the nature of demurrers to the evidence. In a scholarly analysis of the problem, Presiding Justice Van Dyke points out that the hearing officer has no adjudicative powers. If such a motion were to be granted, the board itself would be required to convene to pass on the question, when it has no familiarity with the proceeding. At page 6 the opinion lists the multitude of problems involved and concludes that the very advantages which such motions are designed to attain would be obviated in an administrative hearing before a hearing officer alone. The cases cited by appellants (*La Prade* v. *Department of Water & Power,* 27 Cal.2d 47 [162 P.2d 13] ; *Laisne* v. *California State Board of Optometry,* 19 Cal.2d 831 [123 P.2d 457] ; *Swars* v. *Council of the City of Vallejo,* 64 Cal.App.2d 858 [149 P.2d

397]) contain nothing in contradiction of the conclusion reached in the *Frost* case.

Also complained of is the fact that the board made its order effective forthwith, thereby foreclosing appellants from petitioning it for reconsideration. This exact point was also raised in *Hohreiter* v. *Garrison, supra,* and found to be without merit. It was held that the procedure was in accord with the statutes, that no constitutional rights were violated, and that there was no abuse of discretion in making the order immediately effective. (81 Cal.App.2d at 402-403.)

In this connection appellants contend that by revoking the partnership permit, the board denied Zucker, an innocent party, of a valuable property right in violation of due process. Appellants further argue that the penalty of revocation is excessive and an abuse of discretion. These two points may both be disposed of with the observation that since the trial court remanded the case to the board for a redetermination of the penalty, any discussion of these questions would be premature. As of this time no penalty is in existence. Appellants ask this court to reverse with instructions to the trial court to enter a specific penalty. This would not be proper. The penalty to be imposed is within the discretion of the board, subject only to judicial review for a clear *abuse* of discretion. The board "should not be precluded from exercising [its] discretion either initially or where, as here, some of [its] findings of misconduct are upheld on judicial review and others are not." (*Bonham* v. *McConnell,* 45 Cal.2d 304, 306 [288 P.2d 502].)

Finally, appellants argue that the record reveals that the trial court misconceived its duty in reviewing the board proceedings in that it failed to exercise its independent judgment on the evidence to determine whether the findings of the board were supported by the weight of the evidence, as is required by section 1094.5 of the Code of Civil Procedure. The findings of fact of the trial court completely negative this contention. The argument at this point is based on a passage in the court's memorandum opinion indicating disagreement with the board's disposition of the case but stating that an abuse of discretion is not evident. Read in context, it becomes obvious that these remarks were directed toward the particular penalty assessed, not the question of guilt or innocence. From what we have already said, it is clear that the trial court did not misconceive its duty. Furthermore, the law is settled that an appellate court reviews

the action taken by the trial judge, not his judicial reasoning or comment. (*International etc. Workers* v. *Landowitz,* 20 Cal. 2d 418, 423 [126 P.2d 609]; *Los Angeles City School Dist.* v. *Landier Inv. Co.,* 177 Cal.App.2d 744, 750 [2 Cal.Rptr. 662].)

 There is no merit in appellants' contention that the court erred in failing to grant appellants their costs. It will be recalled that the judgment provides that "each party herein shall bear his own costs and disbursements."

It is provided in section 1095, Code of Civil Procedure that "If judgment be given for the applicant, he may recover the damages which he has sustained, as found by the jury, or as may be determined by the court or referee, upon a reference to be ordered, together with costs; . . ." In *Gould* v. *Moss,* 158 Cal. 548, 549 [111 P. 925], ". . . the court *may* give judgment for costs in *mandamus* proceedings, yet if the judgment does not include costs, the filing of a memorandum of costs by the prevailing party will avail him nothing." (Emphasis by the court.)

It is thus apparent both under the terms of the statute and in the interpretation thereof by the court that the award of costs in a mandamus proceeding is discretionary. Here the court has exercised its discretion by providing that each party shall bear his own costs. The court was entitled to exercise its discretion in this matter and it appears that in the circumstances it acted reasonably.

The judgment is affirmed.

Ashburn, J., and Herndon, J., concurred.

A petition for a rehearing was denied March 2, 1962.