[L. A. No. 8981. In Bank.—March 11, 1929.]

THE CITY OF LOS ANGELES (a Municipal Corporation), Respondent, v. A. E. ANDERSON et al. (No. 159655), OSCAR NORMAN et al. (No. 159656), G. P. CARROLL et al. (No. 159657), J. N. HITE et al. (No. 159658), JOHN DOE PACKER et al. (No. 159659), GEORGE H. DAY et al. (No. 159660), W. W. KITCHEN et al. (No. 159661), JACOB JENSEN et al. (No. 159662), Appellants.

S. C. Schaefer and Henry G. King for Appellants.

Jess E. Stephens, City Attorney, and Joseph T. Watson, Deputy City Attorney, for Respondent.

WASTE, C. J.—By the institution of the several above-numbered actions, which were consolidated for purposes of trial and appeal, the City of Los Angeles sought to recover possession of a triangular shaped strip or parcel of land approximately three-quarters of an acre in extent, and asserted to be reclaimed tide-land. Defendants, by virtue of their occupancy of portions of the land for varying periods,

pleaded as a defense that they had acquired title by prescription. Judgment was entered for the plaintiff city, and defendants have appealed.

From the evidence it appears that in the year 1908 the United States government, for fortification purposes, had caused a survey to be made of the shore line of the ocean in the vicinity of the land here in dispute. D. E. Hughes, the government engineer who made the survey, was called as a witness for the plaintiff, and identified a map, plaintiff's exhibit No. 5, as being an accurate representation of the mean or ordinary high-tide line of a part of San Pedro Bay, now Los Angeles Harbor, as platted by him upon completion of his survey. Examination of the exhibit discloses that the property involved in these actions lies below the mean or ordinary high-tide line as it then existed. In other words, in the year 1908 the property which the plaintiff city now seeks to repossess formed a part of the tide-lands of San Pedro Bay. A breakwater theretofore constructed by the federal government approached within approximately 1800 feet of the shore line. It was subsequently extended landward, the construction work bringing it in touch with the shore being completed in 1912. The triangular shaped strip of land which is the subject of these actions is situate between the present mean high-tide line and the mean high-tide line as it existed in 1908, and has as a base the side of the breakwater as extended. It is plaintiff's contention that this parcel of land, though resulting from accretions, was not of such imperceptible formation as to constitute alluvion belonging to the owner of the upland, but was, in fact, created and formed by artificial means, namely, the deposit of foreign substances against the breakwater, and therefore retains its character as tide-land, title to and possession of which remains in it as successor to and grantee of the state (Stats. 1911, p. 1256), subject only to certain trusts for the public use. On the other hand, the several defendants insistently urge that accretions occurring on the shore line of the ocean belong, under the authorities, to the owner of the abutting upland, thus precluding the plaintiff city—it having neither title to nor interest in the upland—from successfully prosecuting these several actions for possession of accretions thereto.

The witness Hughes, above referred to, established his familiarity with and observations of the locality, and testified that, until the completion of the breakwater in 1912, he had not noticed any change in the mean or ordinary high-tide line as he had platted it in 1908; that in the fall of the year 1912 and shortly after the extension of the breakwater to the mainland, he "noticed a small accretion at the root of the breakwater at the southerly side"; that there was much "speculation as to whether there would be an accretion or not, and [he] noticed with much interest that there was a caving of the bluff to the south some five or six hundred feet south of the breakwater; . . . the prophecy was made that that stuff, . . . would reach to and lodge against the breakwater; and in the course of a few days it began to arrive there, all that slide; the major portion was dissolved and made roily water for weeks, but that which was not dissolved [was] driven by the incessant little wedges and lodged in the gravel making a small fraction of an acre of accretion, and that was . . . in 1912"; that the shale so deposited "came from that slide . . . noticed a few weeks earlier . . . some 500 feet south of the root of the breakwater"; that this accretion was subsequently increased by the addition of material dumped over the neighboring bluffs, and which thereafter found lodgment against the breakwater; that his study and observation of the action of the water with reference to the forming of accretions on the seashore led him to believe that the reason or cause for the formation of these accretions was the "presence of the obstruction made by the breakwater"; that if the obstruction offered by the breakwater had not been present when portions of the neighboring bluffs had broken off, these accretions would not have formed, for the material "would have been driven farther and farther north, so that most of it would have been worn out in transit, and it would finally lodge perhaps a fourth of a mile north of the root of the breakwater . . . "; that in his opinion all subsequent accretions were due entirely to the presence of the breakwater and "to furnishing material by artificial means . . . , material that was dumped by some contractor over the bluff. . . . " The testimony of the witness in this regard was neither materially shaken upon cross-examination nor weakened upon the presentation of defendants' case for, in the main, the several defendants

satisfied themselves with testifying as to their occupancy, for varying periods, of portions of the land formed by the accretions mentioned, and as to the character and value of the improvements placed thereon by them during such occupancy.

In complete accord with the evidence, the trial court, among other things, found that what was originally tide and submerged land was "added to by accretions; that said tideland was thus covered and filled in by such successive operations; that prior to the connection of said breakwater with the mainland no material had been washed up on said tideland, and no appreciable amount of accretions had formed on said tideland; that said tideland was so covered with rocks, gravel, sand and earth by such artificial means—was caused by said breakwater." As matter of law, the court concluded that "said tideland, filled in the manner found in the Findings of Fact, still retains its character as tideland, and is now reclaimed or filled-in tideland; that the owner of the upland, by reason of such ownership, gained no title to such reclaimed or filled-in tideland thus formed; that said reclaimed or filled-in tideland is public land impressed with the public use for purposes of commerce, navigation and fishery, to which defendants, by their occupancy, no matter how long continued, could not gain title by adverse possession." In seeking support for the quoted finding of fact one need only examine the evidence hereinabove briefly narrated. The principal and primary question requiring determination is, whether the conclusion of law deduced from the findings by the court below finds justification in the authorities.

At common law, when land was from natural causes and by small and imperceptible degrees gained from the sea or formed upon the banks of rivers and streams, either by alluvion or dereliction, it belonged and went to the owner of the upland or of the bank, respectively. (2 Blackstone's Commentaries, 262.) Section 1014 of our Civil Code definitely applies this common-law principle to rivers and streams situate within our state boundaries, but the section contains no express reference to the rule of alluvion as it affects the seashore. However, this court, in the case of *Strand Imp. Co.* v. *Long Beach,* 173 Cal. 765, 770–773 [161 Pac. 975, 978], declared that the failure of the section to

treat of alluvion forming upon the seashore did not warrant an inference or conclusion that the common-law rule had been, to that extent, abrogated in this state, for this "would make an omission to say anything on a subject operate as an affirmative declaration repealing an existing law on the subject not mentioned." The right of the upland owner to additions to his land by alluvion, where the land abuts upon the ocean, as recognized in the early case of *Dana* v. *Jackson Street Wharf Co.*, 31 Cal. 118, 120 [89 Am. Dec. 164], was thereupon affirmed, and the enactment of section 1014 of the Civil Code was held not to alter the common-law rule in that respect. ▪ In giving application to this rule, the authorities have consistently declared, in conformity with the common-law acceptation thereof, that, for the owner of the upland to be entitled to the accretions thereto, such accretions must have resulted from natural causes and been of gradual and imperceptible formation. (*Strand Imp. Co.* v. *Long Beach, supra,* p. 771 of 173 Cal. [161 Pac. 975]; *Curtis* v. *Upton,* 175 Cal. 322, 334 [165 Pac. 935].) Where, however, the accretions have resulted, not from natural causes, but from artificial means, such as the erection of a structure below the line of ordinary high water, there is made out a case of purpresture, or encroachment, and the deposit of alluvion caused by such structure does not inure to the benefit of the littoral or upland owner, but the right to recover possession thereof is in the state or its successor in interest, as the case may be. (*Dana* v. *Jackson Street Wharf Co., supra,* pp. 120, 121 of 31 Cal.; *Forgeus* v. *County of Santa Cruz,* 24 Cal. App. 193, 200 [140 Pac. 1092]; *Patton* v. *City of Los Angeles,* 169 Cal. 521, 525 [147 Pac. 141].) ▪ The formation of the triangular shaped piece of land here in controversy having resulted, as found by the trial court on abundant evidence, not from natural causes and by imperceptible degrees, but from the deposit and lodgment of foreign materials, as distinguished from the ordinary wash of the ocean, against the artificial obstruction offered by the government breakwater below the mean high-tide line, such parcel does not attach as alluvion to the ownership of the upland, but retains its character as public land, being in the nature of reclaimed or filled-in tide-land. This being so, the trial court's conclusion of law above quoted was proper under the circumstances of these cases, and the plaintiff

city may properly prosecute actions for the recovery of its possession.

It has long been settled doctrine in this jurisdiction that property held by the state or any political subdivision in trust for public use cannot be gained by adverse possession, and the statute of limitations does not apply to an action to recover such property from one using it for private purposes not consistent with the public use. (*People ex rel. State Board of Harbor Commrs.* v. *Kerber,* 152 Cal. 731, 733, 734 [125 Am. St. Rep. 93, 93 Pac. 878]; *Cimpher* v. *City of Oakland,* 162 Cal. 87, 88–90 [121 Pac. 374]; *City of Oakland* v. *Wheeler,* 34 Cal. App. 442, 454 [168 Pac. 23].) The contention that the respective defendants had, by prescription, obtained title to portions of the controverted strip of land is, therefore, without merit.

The demurrers of the respective defendants were properly overruled, for the amended complaint filed in each action contained all the allegations necessary to the statement of a cause of action in ejectment. (9 Cal. Jur. 1004, sec. 22.) Nor do we find any merit in the contention that the plaintiff city had failed to accept the grant of tide-lands. On May 1, 1911, the legislature passed an act (Stats. 1911, p. 1256) granting to the City of Los Angeles all the right, title and interest of the state in all the tide and submerged lands within the city boundaries, as then constituted, which included the tide-land (now reclaimed or filled in) in controversy here, in trust for certain enumerated uses and purposes which, in general terms, may be described as the uses and purposes of public navigation and commerce. In *Patton* v. *City of Los Angeles, supra,* at page 524 of 169 Cal. [147 Pac. 141], it is stated that, by virtue of said grant "the city of Los Angeles had succeeded to the title of the state." Again, in *Los Angeles* v. *Pacific Coast S. S. Co.,* 45 Cal. App. 15, 17 [187 Pac. 739, 740], it is declared: "The trusts upon which the city of Los Angeles received its title to said premises were the identical public trusts upon which the state had originally received and held said lands up to the time of its said grant of the same to said city. These trusts being for public uses were essentially governmental in their character, and the city of Los Angeles, in taking over from the state the title to said lands for the purpose of fulfilling these trusts, was

merely acting as one of the subordinate governmental agencies of the state, and as such it was by the terms of said act invested with the full title to said premises for the purpose of administering such trusts. This being so, it became possessed of all of the power which the state formerly held in relation to said lands and all of the rights to the ownership and possession thereof which the state had prior to said grant. . . . " These authorities are sufficient to dispose of defendants' contention, and, in addition thereto, the plaintiff city quotes from section 176 of the charter of the City of Los Angeles, as amended in April, 1913 (Stats. 1913, pp. 1629, 1639), and Ordinance No. 27118 (N. S.) of the Los Angeles city council, approved March 14, 1913. There is clearly evinced therein an intention to accept the state's grant of tide and submerged lands within the city boundaries.

The judgments are, and each is, affirmed.

Curtis, J., Langdon, J., Preston, J., Richards, J., Shenk, J., and Seawell, J., concurred.