**JACKSON et al. v. UNITED STATES.**

**No. 6520.**

Circuit Court of Appeals, Ninth Circuit.

Feb. 23, 1932.

Rehearing Denied April 4, 1932.

H. M. Anthony, of San Francisco, Cal., for appellants.

George J. Hatfield, U. S. Atty., and I. M. Peckham, Asst. U. S. Atty., both of San Francisco, Cal.

Before WILBUR and SAWTELLE, Circuit Judges, and McCORMICK, District Judge.

McCORMICK, District Judge.

The government, appellee herein, brought an action in ejectment against appellants, who were defendants in the court below, wherein it sought to recover possession of several structures and buildings, some of

them referred to in the briefs as "shacks," and the land upon which they are located.

The property in controversy lies along the ocean beach, south of the Golden Gate, and is contiguous to the Ft. Funston Military Reservation in the city and county of San Francisco, state of California.

The complaint was in the usual form in ejectment actions in California. The appellants, by answers, admitted that they were in possession of the property described in the complaint; denied the seizin and right of possession of plaintiff; and set up affirmative issues of title by adverse possession. The trial of the case was had before a jury, and at the conclusion of all the evidence, and upon motion of plaintiff the District Judge directed the jury to return a verdict in favor of the appellee herein. The government waived any claim for damages, and, pursuant to direction, the jury found a general verdict in favor of the United States and against the defendants on all the issues made by the complaint and answers, and further found by the verdict that the government is the owner in fee simple and entitled to the possession of all the property described in the complaint, and that appellants are guilty of withholding possession from appellee of portions of said property without any right, title, interest, or estate therein. A judgment in accordance with the verdict was regularly entered by the clerk. This appeal is from such judgment. The assignment of errors are all dependent upon the correctness of the action of the court below in directing a verdict for the government. The appellants contend that the United States is not seized of the property that they are occupying, and further that the claim of the government is barred by the statute of limitations.

From the undisputed evidence, and by stipulation of counsel, it appears that the appellee deraigned title to lands described in section 27, township 2 south, range 6 west, Mount Diablo meridian, and lot 5 therein, through two patents from the United States to Patrick Rogers, dated May 20, 1872, and August 14, 1878, respectively, and that by mesne conveyances the record and paper title to said property passed to the Spring Valley Water Company, which, in turn, had on July 9, 1917, conveyed by deed to the United States the same property; that the westerly line of the property so patented and vested is and has been at all times the high water line of the Pacific Ocean. It was also stipulated that upon the assessment rolls of the city and county of San Francisco from fiscal year 1904-1905 to fiscal year 1916-1917, inclusive, as well as the assessor's block books of said city since 1917, the southeast quarter, section 27, township 2 south, range 6 west, and lot 5 therein, was shown to be assessed to the high water line of the Pacific Ocean, and that from 1909 to 1917 the Spring Valley Water Company paid the taxes on the property assessed, and appellants have at no time paid anything in taxes on any part of lot 5 or upon the land or property that they are occupying. The evidence in the court below without conflict further showed that lot 5 contains considerable high and comparatively level ground running easterly from the ocean, but that close to the seaward or westerly boundary of the lot there is a bluff that rather abruptly slopes to the seashore. Appellants concede that they have no right to any part of lot 5 that lies eastward or landward from the foot of the bluff. They claim the land they are occupying from the base of the bluff westward or seaward. The high water line which marks the westerly boundary of said section 27 and of lot 5 therein is not a fixed or stationary point along the seashore. It has materially changed since 1901. It was then just at the base of the bluff. It is now some distance westward of the bluff.

Some time in the late '80s one Patterson located mining claims along the beach. He went to live on the location, and about that time built a shack immediately below the bluff and west of the high tide line as it was at that time. In order to protect his house from changing tides and seasonal floods, he erected a wooden bulkhead in front or seaward of it. He made the house his habitation until his death in 1906. No transfer of any kind from him or his heirs is alleged or was proved. Subsequent to Patterson's death, and a few days after the earthquake of April 18, 1906, Lincoln E. Savage, from whom appellants claim, took possession of the Patterson shack, and afterward built several more structures out of driftwood immediately to the south thereof.

Savage or the appellants as his successors have been in possession of these buildings since, and have been renting some of them and deriving income therefrom.

The tide changes, together with gradual and imperceptible alluvial deposits that were partially caused by the bulkhead built by Patterson and by bunch grass that was planted along a fence built by the Spring Valley Water Company during its ownership of lot 5, produced more land, so that the high water line of the lot and of said section some time subsequent to 1908 moved westerly and

seaward. The controversy in this case is over the ownership and title of the newly made land. The defendants' evidence in the court below showed that the high tide line of the ocean at all times prior to 1909 was east of the land and buildings in question, and it is admitted that all of the property claimed by the appellants is now easterly of the present existing high water line.

It is settled under the common law that to the owner of the shore belong imperceptible and gradual additions to the land which when once acquired become in all respects a part of the original tract. 2 Blackstone's Commentaries, 262; 3 Thompson on Real Property, § 2441, and cases therein cited. Unless there is some contrary rule applicable in California, it follows that the government, having admittedly perfect title to the upland that is contiguous to the alluvial deposit, is also seized of the new land as accretion.

It is conceded in the briefs of counsel that the laws of California as construed and interpreted by the appellate courts thereof are to be applied here in the decision of this action.

Section 1014 of the Civil Code of California reads: "Where, from natural causes, land forms by imperceptible degrees upon the bank of a river or stream, navigable or not navigable, either by accumulation of material or by the recession of the stream, such land belongs to the owner of the bank, subject to any existing right of way over the bank"; and the Supreme Court of California in Strand Improvement Co. v. Long Beach, 173 Cal. 765, 772, 161 P. 975, 978, said: "The doctrine that the right of alluvion exists in the owner of the seashore, as well as elsewhere, has been recognized in our decisions"; and the same court in the latest case we have examined on the subject, City of Los Angeles v. Anderson, 206 Cal. 662, 667, 275 P. 789, 791, further said: "The right of the upland owner to additions to his land by alluvion, where the land abuts upon the ocean, as recognized in the early case of Dana v. Jackson Street Wharf Co., 31 Cal. 118, 120, 89 Am. Dec. 164, was thereupon affirmed, and the enactment of section 1014 of the Civil Code was held not to alter the common-law rule in that respect."

We are aware of the decision of this court in Western Pacific Railway Co. v. Southern Pacific Co., 151 F. 376, 397, that is in conflict with the rulings of the California appellate courts upon the proper construction of section 1014 of the California Civil Code, but the later decisions of the California Supreme Court are regarded by us as controlling authority in this action.

Appellant contends, however, that, assuming that the land they claim accreted to the property of plaintiff, the accretion has resulted, not from natural causes, but from artificial means by the erection of the bulkhead and by the planting of bunch grass, and that there is therefore made out a case of purpresture or encroachment, and the deposit of alluvion caused by such means does not inure to the benefit of the United States as the littoral or upland owner. See City of Los Angeles v. Anderson, supra.

Appellants' evidence, so far as it tended to show that the accretion to lot 5 was affected in any way by the bulkhead or fence or by bunch grass that was planted, showed only that the artificial means were purely of a defensive nature created and employed by others wholly disconnected and disassociated with the government, and that these instrumentalities were intended and used solely to keep out the sea at times of high water and to protect the land from erosion and the inroads of the ocean. There was no evidence whatever that all the additions were not imperceptible or that there was any necessary causal connection between the existence of the bulkhead and the bunch grass and the alluvial accumulations, and no evidence was introduced to show that the shore line would not be just as it is if the bulkhead or bunch grass had never been so placed. Under these circumstances, the accretion belongs to the owner of the upland, and it cannot be said that it is not made from natural causes within the meaning of section 1014 of the California Civil Code. In Forgeus v. County of Santa Cruz, 24 Cal. App. 199, 140 P. 1092, 1094, the court said: "Again, if any accretion or reliction was formed it was not caused by any act of Kimble or his successors in interest, but it was due to the act of the county in raising the roadbed along said right of way. It could hardly be contended that the county by such artificial means could secure the fee to the alluvion as an addition to its right of way. The alluvion would be an accession to the fee and not to the easement. In Tatum v. City of St. Louis, 125 Mo. 654, 28 S. W. 1003, it is said: 'The riparian owner is entitled to the land formed by gradual and imperceptible accretions from the water, regardless of the cause which produced it. This right he cannot be deprived of by the acts of others over whom he has no control, and for which he is in no way responsible. It was pertinently said by Mr. Justice

Swayne, in St. Clair County v. Lovingston, 23 Wall. 66, 23 L. Ed. 59: "It is insisted by the learned counsel for the plaintiff in error that the accretion was formed wholly by obstructions placed in the river above, and hence that the rules upon the subject of alluvion do not apply. If the fact be so, the consequence does not follow. There is no warrant for the proposition. The proximate cause was the deposit made by the water. Whether the flow of water was natural or affected by artificial means is immaterial." ' "

See, also, State of Kansas v. Meriwether (C. C. A. 8) 182 F. 457; Grant v. Fletcher (D. C.) 283 F. 243, 270; 3 Thompson on Real Property, § 2444. We think that the appellee is seized and entitled to the possession of the property occupied by appellants.

It is further contended, however, that the bar of the statute of limitations had run against the government as to the land and structures appellants occupy. They base this claim upon section 318 of the Code of Civil Procedure of California, which reads as follows: "No action for the recovery of real property, or for the recovery of the possession thereof, can be maintained, unless it appear that the plaintiff, his ancestor, predecessor, or grantor, was seized or possessed of the property in question, within five years before the commencement of the action," and upon section 319 of the same Code, which reads: "No cause of action, or defense to an action, arising out of the title to real property, or to rents or profits out of the same, can be effectual, unless it appear that the person prosecuting the action, or making the defense, or under whose title the action is prosecuted, or the defense is made, or the ancestor, predecessor, or grantor of such person was seized or possessed of the premises in question within five years before the commencement of the act in respect to which such action is prosecuted or defense made."

■■■ The appellant's evidence in the court below was that the high tide line was easterly of all the land and buildings in controversy as late as 1909, and consequently no plea of the statute of limitations would be available in any event prior to that time. The land in question was between high and low tide lines prior thereto, and, until the high tide line moved west of the buildings, no statutes of limitation could commence to run, because the bar of the statutes of limitation is not available against the state of California on adverse possession of tide lands within the state. Constitution of California, 1879, art. 15, § 3; Cimpher v. City of Oakland, 162 Cal. 89, 121 P. 374; People v. Kerber, 152 Cal. 733, 93 P. 878, 125 Am. St. Rep. 93. This rule would effectually dispose of any claim that Patterson was seized or had any title whatever to the lands occupied by him, even if appellants had shown any privity or identity of interest with him. There was no such showing in the court below. As far as the title of the government to the accreted land is concerned, no adverse occupation of any governmental property, however long continued, can affect the right of the United States. See Allen v. McKay, 120 Cal. 338, 52 P. 828; Lockhart v. U. S. (C. C. A. 9) 35 F.(2d) 905. Therefore, the only period of time where it would be possible for appellants to become seized or enjoy any title or right of possession whatever of the land in question would be from 1909 until the acquisition by the government on July 9, 1917. There is, however, an insuperable barrier against the assertion of the statute of limitations by the appellants in aid of a title by prescription, because by section 325 of the Code of Civil Procedure of California, in effect since 1878, and which must be read in considering the application of sections 318 and 319 of the same Code, it is provided that in no case shall adverse possession be considered established under any section of the Code of Civil Procedure, unless it shall be shown that the land has been occupied and claimed for the period of five years continuously, and the party or persons, their predecessors and grantors, have paid all the taxes, state, county, or municipal, which have been levied and assessed against such land. See People's Water Co. v. Boromeo, 31 Cal. App. 272, 160 P. 574. In People's Water Co. v. Lewis, 19 Cal. App. 622, 127 P. 506, 509, the court said:

"It was properly held that the assessment for taxation is of the property, and not against the owner or possessor, and that 'the adverse possessor must be as vigilant to pay all taxes assessed against the property as in holding the possession of the land, and, if he fails by reason of the payment of one tax by the owner before his title has accrued, he fails entirely.'

"In consonance with the plain terms of the law, there is no doubt that for five consecutive years the claimant must pay all the taxes assessed against the property or at least tender such payment during the same period."

The undisputed evidence shows that at all times lot 5 was assessed for taxes to the

**344**

high water line of the Pacific Ocean, and therefore accretion to said lot occasioned by changes of the high water line would be included in such assessments, and would consequently make the land now occupied by appellant a part of the property assessed as lot 5, and, inasmuch as it is conceded that appellants have not paid or tendered any taxes upon the property occupied by them or their predecessor, there is no merit whatever in their contention that they have any prescriptive right to the possession of the land or buildings occupied by them. Moreover, after the transfer of lot 5 to the United States on July 9, 1917, no state statute of limitations could run against title or right to possession that existed in the federal government. See U. S. v. Thompson, 98 U. S. 486, 25 L. Ed. 194.

One further matter asserted by appellants should be mentioned. It is contended that certain evidence offered in the court below of a state court action by Patterson during his occupancy of the land in controversy showed that he maintained his right to possession and established a fee-simple title. We find no merit in this contention. The evidence referred to consisted of the oral testimony of the former judge of the state superior court before whom the case was tried, and it was so uncertain as to identifying the parties, issues, or property involved as well as to the terms or character of the judgment or decree that it is of no value whatever. There was no attempt made at the trial to produce any record evidence of the case or the outcome thereof or to account in any manner for the failure to produce the record. This oral testimony was insufficient to show seizin in Patterson or to affect in any manner the title or right of possession to the land which Patterson was occupying at the time. There is also a contention by appellants that two suits in equity in the United States District Court for the Northern District of California that were commenced by Lincoln E. Savage to restrain threatened acts of the Commandant of the Ft. Funston Military Reservation and the United States established or maintained his right to possession of land in question. These suits were dismissed for lack of prosecution without any adjudication or determination of any kind, and are of no effect whatever upon the title or right of possession of any of the property involved in this action.

The court below properly directed a verdict for the United States, and the judgment is affirmed.