733 P.2d 733

IDAHO FOREST INDUSTRIES, INC.,
an Idaho corporation,
Plaintiff-counterdefendant-respondent,

v.

HAYDEN LAKE WATERSHED
IMPROVEMENT DISTRICT,
Defendant-counterplaintiff,

v.

STATE of Idaho, DEPARTMENT OF
LANDS, Third party
defendant-appellant,

and

State of Idaho, Department of Water Resources; Hayden Irrigation District; and Dalton Gardens Irrigation District, Third party defendants.

IDAHO FOREST INDUSTRIES, INC.,
an Idaho corporation,
Plaintiff-counterdefendant-respondent,

v.

HAYDEN LAKE WATERSHED IMPROVEMENT DISTRICT,
Defendant-counterplaintiff-appellant,

v.

STATE of Idaho, DEPARTMENT OF
LANDS, Third party defendant,

and

State of Idaho, Department of Water Resources; Hayden Irrigation District; and Dalton Gardens Irrigation District, Third party defendants.

Nos. 16163, 16180.

Supreme Court of Idaho.

Feb. 25, 1987.

Jim Jones, Atty. Gen., and Rinda Ray Just, Deputy Atty. Gen., Boise, for third party defendant-appellant Department of Lands.

Stephen B. McCrea, Coeur d'Alene, for defendant-counterplaintiff-appellant Hayden Lake Watershed Imp. Dist.

Scott W. Reed, and James Michael English, Coeur d'Alene, for plaintiff-counterdefendant-respondent Idaho Forest Industries.

BAKES, Justice.

Idaho Forest Industries (IFI) brought suit to permanently enjoin the Hayden Lake Watershed Improvement District (HLWID) from constructing a public beach, docks and parking lot on property allegedly owned by IFI in fee simple. IFI further sought to have title quieted in it as against HLWID and the State of Idaho, which was brought into the suit by HLWID as a third party defendant. Both IFI and the state moved for summary judgment to quiet title to the disputed property in themselves. IFI based its claim to title on both written deeds and the theory of adverse possession.

The state claims title based on the equal footing and public trust doctrines. The district court ruled in favor of IFI, granting the injunction against HLWID and quieting title in IFI as against the state. The state appeals, contending that the district court erred in determining that the disputed property was no longer subject to "public trust" uses. HLWID also appeals, raising the public trust issue and additionally contending that issues of fact exist regarding any rights which it may have under a prescriptive easement theory. We affirm the district court's injunction as to HLWID and reverse the summary judgment quieting title.

The property in question is approximately 30 acres of land that in times past was periodically covered by the waters of Hayden Lake. The land was adjacent to the west arm of Hayden Lake known as Honeysuckle Bay. Title to the disputed property can be traced back to Catherine and Anna Hayden, who presumably obtained the property by patent from the United States in 1909. On June 1, 1909, the Haydens conveyed the property to Arthur D. Jones, who in turn, on June 10th of that year, conveyed the property to Hillyard Townsite Company. The deeds in both these conveyances describe the eastern boundary of the property as the meander line of Hayden Lake, but fail to specifically locate the meander line. In 1910, Hillyard Townsite Company constructed a dike across the easterly portion of the property, preventing the periodic flooding of the land. This caused the land to the west of the dike to be dried up much of the time.

Two years following the construction of the dike, a lawsuit was brought by the Hayden-Coeur d'Alene Irrigation Company, contending that the dike illegally interfered with the irrigation company's water rights. The irrigation company had constructed a pumping station at the west end of Honeysuckle Bay, and construction of the dike had cut off flow of lake waters to that pumping plant. As a result of that litigation, Hillyard Townsite Company was required to maintain a flow of water to the pumping station so as not to interfere with the irrigation company's water rights. A spillway was constructed in the south end of the dike to allow water from the lake to reach the pumping station of the irrigation company via a canal constructed from the spillway to the pumping station. However, Hillyard was not required to remove the dike. The spillway is currently under the control of HLWID. The spillway and approximately 5 acres of land to the west and adjacent to the dike and spillway were conveyed by IFI to HLWID's predecessor in interest. This 5–acre parcel is used as a sump area to drain the overflow waters of Hayden Lake. HLWID is charged with maintaining the level of the lake at a high water mark judicially determined in 1962 to be a level of 2,239 feet above sea level. When the water exceeds this level, the gates on the spillway are opened and the overflow waters are discharged into the 5–acre parcel of land and the old canal that connected to the irrigation pumping station. If sufficient quantities are released through the spillway, waters overflow the canal and the 5–acre parcel and enter onto IFI's property.

In 1920, the Hillyard Townsite Company conveyed the disputed property to Atlas Tie Company, a business entity which ultimately became Idaho Forest Industries (IFI). IFI has claimed title to the property under the 1920 deed to the present. The 1920 deed describes the eastern boundary of the property as the shore line of the lake, which in 1920 would have constituted the east side of the dike. IFI does not dispute that some portion of its property at one time constituted lakebed of Hayden Lake, i.e., was submerged land. However, IFI claims that since the construction of the dike the disputed property has not been under water except in years of extra high runoff when the lake floods.

The state contends that the land in question is partly submerged 4 to 5 months of the year during spring runoff, and that a portion of the disputed property serves as a natural sump area to drain the overflow waters of the lake. The state further con-

tends that the sump area serves as a recharge zone for the Rathdrum aquifer.

IFI currently leases the property to Tom and Shiela Richards. The Richards use the property as dry grazing land and at times have cultivated crops of barley and alfalfa on the property. In 1979 the land was appraised by the Kootenai County assessor and classified as "other rural land" valued at $5,000 per acre. IFI appealed, contending that, because of the intermittent flooding, the land was not suitable to development other than agricultural use and that the maximum value of the land was $500 per acre. The Idaho Board of Tax Appeals found that all but 20% of the approximately 30 acres was subject to flooding and could not be developed for housing. Thus, since 1979 the land continues to be classified as agricultural land.

The State of Idaho raises two issues on appeal: (1) whether the trial court erred in holding as a matter of law that the disputed property is no longer impressed with the public trust and thus subject to a claim of adverse possession; and (2) whether the district court erred in holding that IFI met its burden as to each of the elements of adverse possession by clear and satisfactory evidence. HLWID raises as an additional issue on appeal whether, even if IFI has title quieted to it, HLWID, which is charged with maintaining the level of the lake at 2239 feet above sea level, has obtained a prescriptive easement against IFI for use of the spillway and the 30 acres to drain the runoff waters of Hayden Lake.

## I

 The district court's order enjoined HLWID "from planning or constructing a roadway, beach area, swimming area or docks upon or adjoining" IFI's property which includes the dike. HLWID clearly has no claim to the disputed property based upon the equal footing or public trust doctrines. Those doctrines would grant title solely to the state, subject to the public trust. The state has not, as far as the record discloses, granted any interest in the property to HLWID for purposes of constructing the proposed beach, docks, and parking lot.[1] Furthermore, we find appellant HLWID's arguments regarding a prescriptive easement theory to be without merit. It is the long established rule in this jurisdiction that any right gained by prescription is confined to the right as exercised during the prescriptive period. "It is limited by the purpose for which it is acquired and the use to which it is put." *Azteck Limited, Inc. v. Creekside Inv. Co.,* 100 Idaho 566, 568, 602 P.2d 64, 66 (1979). Appellant HLWID has continuously used the easement for roadway purposes, and respondent IFI concedes that a public easement exists for the road on top of the dike. However, the proposed expansion of the easement by HLWID to include public beaches, docks and parking area is clearly outside the scope of the existing public easement for the road along the top of the dike. There is no disputed issue of fact regarding the fact that HLWID's proposed expansion exceeds their rights under the existing roadway easement along the top of the dike. Accordingly, the decision of the district court enjoining HLWID is affirmed.

## II

The issues surrounding rights in the disputed property as between the state and IFI are somewhat more involved than those as between IFI and HLWID. The state claims title to the property under the correlative doctrines of equal footing and public trust. IFI claims title by deed and adverse possession. The parties and the district court in essence assumed that the state at one time held title to the property under the equal footing and public trust doctrines, but the district court held that the public trust character of the disputed property ceased to exist with the building

---

1. HLWID's proposed project must first be approved pursuant to the applicable provisions of I.C. §§ 58–142 through 58–148. Indeed, it is questionable whether the 1983 easement given HLWID by the state for the dike road would have met the requirements of the above provisions.

of the dike, thereby exposing the disputed property to a claim of adverse possession by IFI. The district court held that IFI had adversely possessed the disputed property as against the state and quieted title to IFI on those grounds. As explained below, we find that material issues of fact exist which preclude entry of summary judgment, and that there may be legal impediments to IFI's claim of adverse possession, and therefore reverse the decision of the district court.

Idaho was admitted to the Union in 1890 on equal footing with its sister states in every respect. Idaho Admission Bill § 1 (1890). The state obtained title to all land below the high water mark of navigable waters within the state at the time of its admission based on this equal footing doctrine. *See Shively v. Bowlby,* 152 U.S. 1, 14 S.Ct. 548, 38 L.Ed. 331 (1894). The scope of the state's title in such lands extends to the natural high water mark as it existed at the time the state was admitted into the Union. *Callahan v. Price,* 26 Idaho 745, 146 P. 732 (1915); *Driesbach v. Lynch,* 71 Idaho 501, 234 P.2d 446 (1951); *Kootenai Environmental Alliance v. Panhandle Yacht Club,* 105 Idaho 622, 671 P.2d 1085 (1983); *Heckman Ranches, Inc. v. State,* 99 Idaho 793, 589 P.2d 540 (1979) (which, for purposes of that case, accepted the trial court's application of the definition of natural or ordinary high water mark contained in I.C. § 58–104(9), being "the line which the water impresses on the soil by covering it for sufficient periods to deprive the soil of its vegetation and to destroy its value for agricultural use").

■ While the state obtained title to lands underlying the navigable waters upon admission to the Union, based upon the equal footing doctrine, that title was subject to a public trust.

"In forming new states out of its territories, the United States reserved to itself vast land holdings, but tidelands and lands under navigable waters were not among the reserved lands. Those lands have been held securely in trust for the people of the future states, and upon admission to the Union, each new state took title and succeeded to the trusteeship." Stone, *Public Rights in Water Use and Private Rights in Land Adjacent to Water,* 1 Waters & Water Rights, § 36.4(A) (R. Clark, Ed., 1967). This trust preserves the public's right of use in such land and, as a result, restricts the state's ability to alienate any of its public trust land. *Illinois Central R.R. Co. v. Illinois,* 146 U.S. 387, 13 S.Ct. 110, 36 L.Ed. 1018 (1892). Initially the public's right of use was limited to those uses incident to navigation. Stone, *Public Rights in Water Use, supra.* However, the public trust doctrine has been expanded to include uses other than those strictly incident to navigation. *Kootenai Environmental Alliance, Inc. v. Panhandle Yacht Club, Inc.,* 105 Idaho 622, 671 P.2d 1085 (1983) (public trust uses include those of fish and wildlife habitat, recreation, aesthetic beauty and water quality); *accord* Stone, *Public Rights in Water Use, supra.*

■ As the foregoing authorities indicate, the doctrines of equal footing and public trust, though related, are distinct in their functions. The equal footing doctrine grants legal title to the state in all lands below the natural high water mark of navigable waters as they existed at the date of admission into statehood. The public trust doctrine, on the other hand, does not grant title of such lands to the state but merely preserves inviolate the public's use of those lands.

■ While the public trust includes uses in addition to the navigation use, it is clear that the public trust arises only in land below the natural high water mark of *navigable* waters. There is no "public trust doctrine" relating to land which is wholly independent or unconnected with such navigable waters. "The source of modern trust law is found in ... the nature of property rights in rivers, the sea, and the seashore." Sax, *The Public Trust Doctrine in Natural Resource Law: Effective Judicial Intervention,* 68 Mich.L.Rev. 471, 475 (1970). The clearly established law of this state is that "[t]he State of Idaho holds

title to the beds of all *navigable* bodies of water below the natural high water mark for the use and benefit of the public." *Kootenai Environmental Alliance, Inc. v. Panhandle Yacht Club, Inc.,* 105 Idaho 622, 625, 671 P.2d 1085, 1088 (1983) (emphasis added).

In the summary judgment proceedings before the trial court, Idaho Forest Industries argued that even if some portion of the subject property might have been within the natural high water mark of the lake at the time of admission of Idaho to the Union in 1890, and thus trust property, nevertheless as a result of the construction of the dike the land was no longer covered with navigable water and therefore the property had lost its public trust status and was subject to adverse possession under our decision in *Rutledge v. State,* 94 Idaho 121, 482 P.2d 515 (1981). The trial court granted IFI's motion for summary judgment, relying on *Rutledge,* concluding that once water has receded the underlying land is no longer protected by the public trust doctrine and the state's title was subject to adverse possession. The district court stated that the *Rutledge* decision was controlling and that IFI could acquire any interest which the state might have by adverse possession because the land was "no longer submerged, and thus no longer within the scope of the public trust doctrine."

*Rutledge* did hold that once a body of water loses its "navigable" status, so also does the land under it lose its public trust status, making the state's title subject to adverse possession. No issues were raised in *Rutledge* as to public trust uses other than navigation. In the *Rutledge* case the natural channel of the Boise River had changed substantially over the years, and a portion of the former river bed had been developed into a motel property. The Court in *Rutledge* held that the dried up branch of the river, having lost its navigable status, had lost its public trust status also and was subject to adverse possession. We note that no issue was raised in the *Rutledge* case regarding the manner by which that portion of the Boise River had lost its navigable status. Whether the changing of the channel was natural or manmade was never raised by either party on appeal. The Court's opinion in *Rutledge* did not indicate whether any manmade dike or diversion, or any upstream dam directly or indirectly resulted in the change of the natural channel which resulted in the particular branch of the Boise River losing its navigable status. Although the parties in *Rutledge* argued about whether the shift in the Boise River channel was the result of avulsion or accretion and reliction, there was nothing in the *Rutledge* case to indicate that the change in the channel was caused either by Rutledge or by his predecessors in interest.

The public trust doctrine is based upon common law equitable principles. That is, the administration of land subject to the public trust is governed by the same principles applicable to the administration of trusts in general. Bogert & Bogert, *Law of Trusts,* § 6 (1973) ("The English system of equity jurisdiction ... now constitutes the foundation on which present day American trust law rests."). All questions concerning public trust lands in this state are questions of state law. Stone, *Public Rights in Water Use, supra,* § 36.4(A) ("Since *Pollard v. Hagan* [44 U.S. (3 How.) 212, 11 L.Ed. 565 (1845)] it has been clear that rights ... in lands under navigable waters within state boundaries are governed and controlled by state, rather than federal, law."). While those equitable principles in certain circumstances may no longer apply to public trust property which has lost its navigable status naturally, *Rutledge v. State, supra,* it may well be that a loss of navigability resulting from a manmade dike or diversion may not, for equitable reasons, eliminate or destroy the public trust status of land which was once subject to that public trust. We deem it inappropriate on the status of this record to attempt to determine under what circumstances a manmade destruction of navigability could eliminate the public trust status of state land. There are important material issues of fact which must be resolved before a final equitable decision could be

made. First, an issue of fact exists over whether or not the property in question ever was public trust property. While Idaho Forest Industries conceded, for purposes of its motion for summary judgment, that some part of the disputed property "may have been lakebed in 1890," it nevertheless asserted throughout the proceedings that there is no evidence in the record that the subject property was ever property subject to the public trust. There is no direct evidence in the record of the location of the natural high water mark of Hayden Lake at the date of the admission of Idaho into statehood in 1890. The circumstantial evidence is subject to varying conclusions, none of which were resolved by the trial court. Therefore, a material issue of fact exists over whether or not the subject property ever was subject to the public trust doctrine.

### III

The state argues that the granting of summary judgment is further erroneous in this case because an issue of fact exists over whether or not the property in the present case was entirely free from water overflowing it. Thus, the state argues that this case is unlike the *Rutledge* case in that the property in question has not ceased to have navigable water overflowing it. Based upon the same contested factual record, HLWID raises an additional issue concerning whether or not it has obtained a prescriptive easement over a portion of IFI's property west of the dike to drain runoff waters of Hayden Lake resulting from the discharge by HLWID through the spillway in the south end of the dike of substantial amounts of flood water over portions of IFI's property. There is evidence in the record which indicates that the property has had waters from Hayden Lake overflowing it subsequent to the construction of the dike, resulting from the 1912 court decree which required IFI's predecessor in interest to maintain a flow of water to a pumping station of the Hayden-Coeur d'Alene Irrigation Company. Evidence in the record indicates that in the recent past water entering the property *via*

the spillway in the dike has reached depths of five to six feet over portions of the disputed property. To the extent such overflow waters could be determined to be "navigable," the property may be subject to the public's right of use. *Southern Idaho F. & G. Ass'n v. Picabo Livestock, Inc.*, 96 Idaho 360, 528 P.2d 1295 (1974). In *Southern Idaho F. & G. Ass'n*, we affirmed the trial court's definition of navigability as "[a]ny stream which, in its natural state, will float logs or any other commercial or floatable commodity, or is capable of being navigated by oar or motor propelled small craft for *pleasure* or commercial purposes...." 96 Idaho at 362, 528 P.2d at 1297. We also affirmed the trial court's characterization of the navigability test as one simply to determine "the suitability of a particular water for public use," 96 Idaho at 363, 528 P.2d at 1298, which use includes " 'fishing, hunting and all recreational purposes.' " *Id., quoting People v. Mack*, 19 Cal.App.3d 1040, 97 Cal.Rptr. 448, 451 (1971), and *citing Day v. Armstrong*, 362 P.2d 137 (Wyo.1961).

In the present case a material issue of fact exists over whether sufficient overflow waters have existed on the area west of the dike to constitute that area a navigable body of water. The facts of our *Rutledge* decision are distinguishable from the facts of the present case. In *Rutledge* the property in question, while once a part of the river bed of the Boise River, a navigable stream, had been totally dry for many years due to a change in the river channel. Here, however, there are unresolved factual questions concerning how often and how much the disputed land, or some portion thereof, is covered with overflow water. Accordingly, it was error to grant summary judgment to IFI.

The district court did not first determine if, and to what extent, the disputed property constituted land below the natural high water mark of a navigable body of water at the time Idaho was admitted into statehood. While the district court and the parties all agreed that at least some portion of the disputed property was covered by wa-

ter prior to construction of the dike, there is no direct evidence in the record indicating whether such condition existed as of the date Idaho was admitted into statehood. The only direct evidence submitted to the district court by appellants regarding the natural high water mark of Hayden Lake at or prior to statehood consisted of the original survey conducted by the Government Land Office (GLO) in 1880. The 1880 survey does depict the meander line of Hayden Lake. However, as indicated by the district court and admitted by the parties, the GLO meander line is obviously inaccurate and bears no resemblance to the shoreline of the lake.

The lake itself is a unique hydrological structure in that, while it has a substantial inflow, it has no permanent outlet. The evidence indicates that the lake is drained by seepage through its west arm, which is hydrologically connected to the Rathdrum aquifer. The evidence also indicates that the level of the lake fluctuated considerably prior to the construction of the dike by IFI's predecessor in interest. Included in the "Answers to Plaintiff's First Interrogatories" submitted by the state is a memorandum to the Director of the State Department of Lands from the Chief of the Bureau of Navigable Waters. In that memorandum, the author indicates that the degree of fluctuation in the lake level was more pronounced prior to construction of the dike. "After the dike was built, the level of Hayden Lake never dropped *as much* because the sump was effectively eliminated." R. Vol. 3, p. 32. The record also contains a report of maximum and minimum lake levels for Hayden Lake covering the years 1930 to 1960. That report indicates a very substantial difference of nearly 23 feet between the observed highest and lowest levels of the lake over that 30-year period. R. Vol. 3, p. 71. Without a determination of what the natural high water mark of Hayden Lake was at the date Idaho was admitted into the Union, a material issue of fact exists as to whether or not we are even dealing with public trust land in the first place.

Additionally, a material issue of fact exists regarding the navigability of the overflow waters periodically present on the disputed property since the construction of the dike. If such waters have been, and continue to be periodically present on the disputed property in a sufficient amount to be navigable, our holding in *Rutledge* is inapposite. The disputed factual issue of alleged periodic flooding also affects the additional issue raised by HLWID regarding its claim that it has obtained a prescriptive easement over a portion of IFI's property west of the dike to drain runoff waters of Hayden Lake because of the use of the spillway in the south end of the dike. HLWID is charged with maintaining the level of Hayden Lake at 2239 feet, and in operating the spillway has periodically flooded portions of IFI's property. However, the district court did not address the issue of a prescriptive easement for draining runoff waters. Since we are reversing the district court's summary judgment order regarding the trust nature of the property, any issue regarding this alleged prescriptive easement for draining runoff waters remains before the district court for its decision.

The summary judgment of the district court is affirmed as to the injunction against HLWID, and reversed and remanded as to the quiet title action against the State of Idaho, and remanded for determination of the prescriptive easement claim of HLWID to intermittently overflow portions of the property. No costs or attorney fees allowed.

SHEPARD, C.J., and DONALDSON and HUNTLEY, JJ., concur.

HUNTLEY, Justice, concurring.

While concurring in the majority opinion, I write separately to further clarify the import of *Rutledge v. State*, 94 Idaho 121, 482 P.2d 515 (1971), and to more specifically address the issue on appeal.

As the district court, in its memorandum decision, explained: "For the purposes of this [summary judgment] motion, the Plaintiff [Idaho Forest Industries] does not dis-

pute the fact that at least some portion of the twenty-nine acres in dispute was lakebed prior to the building of the dike in 1909." The district court further observed: "Since it is not disputed that, prior to the construction of the dike, at least a portion of the disputed real property was below the natural high water mark of Hayden Lake, it is clear that title to such part of the property was held by the State for the use and benefit of the people."[1] The district court then succinctly framed the question before it and summarized its answer:

> The primary question involved in resolving the dispute between the Plaintiff and the State of Idaho is *whether or not the construction of the dike, which altered the natural shoreline of the lake, coupled with the passage of time, has resulted in the loss of such title by means of the doctrine of adverse possession.* Overriding all other issues, of course, is the question of whether or not there are material facts in dispute which would preclude the granting of summary judgment.
>
> The record in this case clearly establishes that *there are no material issues of fact in dispute with respect to the question of whether or not the State can be subject to the doctrine of adverse possession as such doctrine pertains to the facts established in this case by such record.* (Emphasis added).

The state appeals from this conclusion that riparian land owners can dike or otherwise drain and fill state lands held in trust, and subsequently obtain title to those lands by means of adverse possession.

Private concerns acting without the state's authority clearly cannot drain away navigable waters in order to adversely possess lands impressed with the trust. The California court long ago correctly held as follows:

> Where the accretions have resulted, not from natural causes, but from artificial means, such as the erection of a struc-

ture below the line of ordinary high water, there is made out a case of purpresture, or encroachment, and the deposit of alluvion caused by such structure does not inure to the benefit of the littoral or upland owner, but the right to recover possession thereof is in the state or its successor in interest, as the case may be. *City of Los Angeles v. Anderson,* 206 Cal. 662, 275 P. 789, 791 (Cal.1929).

The California court further held that trust lands thus artificially encroached upon "cannot be gained by adverse possession...." *Id.* Overwhelming authority is in agreement. *California ex. rel. State Lands Commission v. United States,* 457 U.S. 273, 102 S.Ct. 2432, 2435, 73 L.Ed.2d 1 (1982); *City of Long Beach v. Mansell,* 3 Cal.3d 462, 91 Cal.Rptr. 23, 28 n. 4, 476 P.2d 423, 428 n. 4 (1970) (both cases citing *City of Los Angeles v. Anderson* as controlling); *State v. Sause,* 217 Or. 52, 342 P.2d 803, 826 (1959); *see generally* Annotation, *Acquisition by Adverse Possession or use of Public Property Held by Municipal Corporations or Other Governmental Unit Otherwise than for Streets, Alleys, Parks, or Common,* 55 A.L.R.2d 554, §§ 15, 16 (original and later case service volumes).

*Rutledge* is not to the contrary. As revealed in the *Rutledge* record, the litigants' alternative theories to explain the change in the Boise River's course were a sudden avulsion versus a gradual accretion and reliction. Plaintiff Rutledge, the riparian landowner, advanced the latter explanation. The State contended that the river's course changed avulsively in 1878 through high flow flooding. Although there was some evidence at the district court level of human alterations along the river which may have influenced its course, these alterations were not carried out by Rutledge, were not directly associated with the area at issue, and were attributed only incidental significance. In fact, on appeal, the State's brief made no mention of any possi-

---

**1.** Justice Bakes correctly notes that IFI concedes this only for the purposes of its summary judg-

ment motion.

ble human influences, but rather relied entirely on its theory that the river had changed avulsively and its argument that such a change should not influence its property interests. Consequently, *Rutledge* only decided that where a river changes course, whether avulsively or through accretion and reliction, and without the riparian owner contributing to the change, leaving the former river bed completely dry and above the new high water mark, then the former river bed is subject to adverse possession.

In contrast, the instant case apparently involves the construction of a dike for the express purpose of holding back the waters of Hayden Lake. Such filled or otherwise drained trust land must remain impressed with the public trust and not subject to adverse possession. *City of Los Angeles v. Anderson, supra; State v. Sause, supra;* Annotation, *supra,* 55 A.L.R.2d 554, §§ 15 and 16. *Cf.* City of *Berkeley v. Superior Court,* 26 Cal.3d 515, 162 Cal.Rptr. 327, 339, 606 P.2d 362, 374 (1980) (though not in the instant circumstances, "some reclaimed land might be eminently useful for trust purposes...."); *Opinion of the Justices,* 383 Mass. 895, 424 N.E.2d 1092, 1103 (1981) ("As to lawfully filled [formerly] submerged land, appropriate consideration must be given to the identity of the land, the nature of the Commonwealth's (and the public's) continuing interest, if any, in that land, and the use to which the land is or may be put.") If they were subject to adverse possession, the state would be left vulnerable to surreptitious drain and fill operations which would destroy important wetlands and rob Idahoans of the associated resources and values. Because of the important policy interests associated with trust lands, this Court has held them immune from adverse possession. *Ehco Ranch, Inc. v. State ex. rel. Evans,* 107 Idaho 808, 812, 692 P.2d 454, 459 (1984); *Rutledge, supra; accord, e.g., City of Los Angeles v. Anderson, supra.*

If we held otherwise, adverse claimants could accomplish by wrongful, unilateral action what the state itself could not accomplish by voluntary conveyance, namely the alienation of public trust land for purely private purposes. The state may convey public trust lands only where the conveyance serves public trust interests. This Court has stressed that the state must carefully weigh competing trust interests prior to alienation. The conveyance generally remains subject to the public trust even after title has passed. *See Kootenai Environmental Alliance, supra.* Adverse possession would defeat all of these public interest protections. Former trust lands are not subject to adverse possession by means of drain and fill, diking, or other operations carried out by riparian owners to remove the waters from the lands.

As Justice Bakes observes, the case must be remanded to the district court for resolution of factual disputes. It remains unclear whether the area at issue is yet submerged under navigable waters due to periodic flooding, and whether and to what extent the area *ever was* below the high water mark and thus impressed with the public trust. However, it is important that we address the issue on appeal to establish the correct legal background for the district court to properly conclude the case.

DONALDSON and BISTLINE, JJ., concur.

SHEPARD, Chief Justice, specially concurring.

I concur with the majority opinion, but write only to point out the difficulty in the majority's use of "land below the natural high water mark." I believe it is necessary to enlarge upon that definition since, as pointed out in the majority, the water level prior to the construction of the dike fluctuated substantially. Even after the construction of the dike, there is evidently still remaining a considerable fluctuation of the water level. Hence, I believe that the refinement of the term "natural high water mark," set forth in *State ex rel. Hamon v. Fox,* 100 Idaho 140, 594 P.2d 1093 (1979), is significant, wherein the Court indicated that the "mean" high water mark is the delineation of the State's ownership as of

**522**

the time of statehood. Although the Court in *Heckman Ranches, Inc. v. State et. al.,* 99 Idaho 793, 589 P.2d 540 (1979), had for consideration the ownership of the State in the bed of a river in which the water level fluctuated, no refinement was used beyond the term "natural or ordinary high water mark." However, the Court there held, "[T]he term 'natural or ordinary high water mark' of a stream or river is defined by I.C. § 58–104(9) as 'the line which the water impresses on the soil by covering it for sufficient periods to deprive the soil of its vegetation and destroy its value for agricultural purposes.'"

In *Heckman,* the Court noted that the Chief of the Bureau of Navigatable Waters for the State of Idaho Department of Lands, defined the natural or ordinary high water mark as "the line which the water impresses on the soil so as to deprive it of vegetation and its value for agricultural use." He indicated that his determination was based upon a visible line of escarpment caused by the action of the water and upon an examination of vegetation. His definition of agricultural purposes for the determination of the boundary was, "land that could be cultivated for crops or at least at the minimum used as hay ground or relatively high quality pasture land." He further indicated that the land below the line he considered the natural or ordinary high water mark, contained large boulders, gravel and sand deposits and was unsuitable for agricultural purposes. He further indicated that "periodic inundation of land would not alter the location of the natural or ordinary high water mark of a river unless the inundation was severe enough to destroy the land for agricultural purposes."

The extensive discussion of the determination of the natural and ordinary high water mark in *Heckman* is worthy of note and consideration by the trial court upon remand.